The State v. Medlicott.

---

## THE STATE OF KANSAS v. JOHN J. MEDLICOTT.

1. JURORS—*Their Opinions and Qualifications.* Impressions not amounting to opinions, received from newspaper articles or rumor, do not disqualify a juror, and are not cause for challenge. (VALENTINE, J., dissenting.)

2. WITNESSES; *Names on Information.* It is not error to permit a witness on the part of the state in a criminal prosecution, whose name has become known to the prosecutor after the commencement of the trial, to testify, even though the name of such witness has not been indorsed upon the information. (All the Justices concurring.)

3. DYING DECLARATIONS; *Rule of Admissibility.* Statements not under oath can only be admitted in evidence as dying declarations when they are made *in extremis,* and where the death of the person who made the declaration is the subject of the charge, and where the circumstances of the death are the subject of the declaration, and the person making them is in the full belief that he is about to die; and this condition of the mind must be made clearly to appear.

4. EXPERTS; *Professional Opinions of Physicians.* A witness cannot be permitted to testify as an expert, as to his opinion founded on certain facts and upon a part of the medical testimony in the case, it not appearing what part of the testimony he has heard. Such testimony is not proper even on cross-examination as a test of the witness' capacity.

5. INSTRUCTIONS, *should be pertinent.* Instructions which are not necessary, and which are not calculated to assist the jury in deciding on the issues submitted to them, ought not to be given, although they are correct statements of the law upon the subject or point to which they relate.

*Error from Anderson District Court.*

ISAAC M. RUTH was found dead in bed at his residence in the city of Lawrence, Douglas county, on the morning of

17

April 27th, 1871.    His death was claimed to have been pro-
duced by means of poison.    Defendant *Medlicott* was a
practicing physician and surgeon in Lawrence, and was
Ruth's family physician, and from his own testimony it
appeared that he was at Ruth's on the night of the 26th of
April; that while there he played a few games of chess with
Ruth; that Ruth complained of being unwell, and *Medlicott*
prescribed quinine, and that *Medlicott* left Ruth's house about
half past ten at night.    Ruth's wife was absent, and besides
Ruth there was no one in the house except the children of
Mrs. Ruth by a former marriage.    *Medlicott* was charged
with the killing of Ruth, and an information was duly filed
against him for murder in the first degree.    Upon his appli-
cation, and upon the ground that the prejudice of the people
of Douglas county was so great against the defendant that he
could not have a fair and impartial trial in that county, the
place of trial was changed to Anderson county.    The case
was tried at the September Term 1871.    The errors com-
plained of, and the facts and evidence in relation thereto, so
far as they are material to the decision of the case, are
sufficiently stated in the opinion.*    One of the witnesses
called by the state was a man named Henry Johnson, who
was under indictment for burglary, and who testified to
several alleged conversations with *Medlicott* while both were
confined in jail awaiting trial, and to several alleged confes-
sions or admissions made by *Medlicott*.    The defense claimed
that the testimony of Johnson was false, and that it had been
induced by reason of promises on the part of the prosecuting
attorney that the proceedings against him should be discon-
tinued.    At the instance of the prosecuting attorney the court
gave the following instructions :

"1. Criminal prosecutions in the State of Kansas, in the
district courts of the state, are under the control of a county

---

[* THE record in this case contains 1080 pages, and the brief of the appellant contains
over 60 closely-printed pages.  If both were printed in full they would make a volume
larger than this book.  Appellant's brief discusses the testimony, the instructions, and
the law, at length, and it has been found impossible to bring it within proper limits for
a book of reports and do justice to the counsel.—REPORTER.]

attorney, who must be a member of the legal profession, and who personally conducts the cause on the trial, and in every stage of it before the court this officer is the representative of the public; and such assisting counsel as he may have are held in the same capacity.

"2. It is the duty of the prosecuting officer in his respective county to determine not only whether criminal parties can be convicted, if prosecuted, but likewise whether or not the public interest requires the prosecution to be carried on; and there are circumstances in which the question, whether or not a prosecution shall be carried on against a particular person, addresses itself to the discretion of the prosecuting officer, even though there are no legal doubts concerning technical guilt of an offender. And in this state the prosecuting officer, upon filing in the court a written statement showing reasons for not prosecuting a particular person charged with an offense, in the discretion of the court such officer may be allowed no further to prosecute the person charged for such offense, or the prosecution in such case be dismissed. On the other hand, if a prosecuting officer should neglect or fail to prosecute an offender upon proper affidavit filed of the commission of crime, the district judge may compel by attachment, fine or imprisonment, the prosecuting attorney to fulfill his duty in such prosecution."

The appellant asked a large number of instructions, many of which were refused. Some of those refused are set forth and discussed in appellant's brief, and among those so asked and refused, and commented upon by the court, is the following:

"40. That in regard to verbal admissions of the defendant, they are to be received and considered with great caution, for besides the danger of mistakes from misapprehension of the witness, the misuse of the words, the failure of the party to express his own meaning, and the infirmity of memory, it should be recollected that the mind of the prisoner himself is oppressed by the calamity of his situation, and he is often influenced by motives of hope or fear, to make an undue admission; the zeal, too, which so generally prevails to detect offenses, especially in aggravated cases, and the strong disposition in the person engaged in the pursuit of evidence, to rely on slight grounds of suspicion which are exaggerated into sufficient proof, together with the character of the person

necessarily called as a witness in secret and atrocious crimes, all tend to impair the value of this kind of evidence."

The jury returned a verdict of guilty of murder in the first degree, and the defendant was sentenced to suffer the penalty of death. From this judgment he appeals to this court, and brings the record here for review.

*Thacher & Banks,* and *Nevison & Riggs,* for appellant:

1: The court erred in overruling the challenge of the defendant to persons summoned as jurors, to which defendant excepted. The defendant was entitled to twelve, and the state to six peremptory challenges. Gen. Stat., 852, §§ 198, 199. The court below wrongfully overruled challenges of defendant, for cause, to three candidates for jurymen, Anderson, Maghee, and Newton. Each of them showed that he had an impression, or had formed a belief or opinion upon the question of appellant's guilt or innocence. Each of these candidates was duly challenged for cause, and the challenges were overruled by the court, and the defendant challenged said candidates peremptorily and exhausted his other nine peremptory challenges. His peremptory challenges were thus practically reduced to *nine.*

The question was fairly raised for this court whether the challenges for cause were properly overruled. (1 Kas., 472, 473.) It is made by statute a ground of challenge for cause, that a person summoned as a juror, has "formed or expressed" an opinion on the issue or "any material fact to be tried." Crim. Code, § 205, Gen. Stat., 853.

Waterman, in his work on new trials, lays it down as an invariable rule, that "there should be an entire absence, not only of all ill-will and prejudice, but also of any, even the slightest bias." He says: "This proposition is quite plain, *and it is universally acknowledged.*" 2 Gr. & Wat. on New Tr., 367.

The general proposition of law contained in our statute is pretty generally recognized in decided cases in other states. *Goodwin v. Blackley,* 4 Ind., 438; 14 S. and R., 292; 1 Den.,

281; 3 id., 121; 2 Gr. & Wat. New Tr., 366 to 375; *Mc-Lean v. State*, 10 Yerg., 241; *Trumble v. State*, 2 Greene, (Iowa,) 404; 7 Cow., 121; 1 Johns., 310; 9 Pick., 499; 6 Cal., 227; 8 id., 359.

In the case at bar it may be said that, in the first place, the distinction attempted to be drawn by the court between an *opinion* and an *impression* requiring evidence for its removal, is extremely technical, fine-drawn, unfair, and seems not to be treated with very great respect by the text-writers. Waterman says: "Such a distinction seems to be *rather nominal* than real." 2 Gr. & Wat. New Tr., 378.

The court seems to have been misled by that class of cases of which *Baldwin v. State*, 12 Mo., 223, is a type—cases founded upon a statute expressly providing that, "if the opinion is founded only on a rumor, and not such as to prejudice or bias the mind of the juror, he may be sworn." This provision was in our criminal code of 1859; but in our present statute this clause is entirely left off, leaving the provision that forming or expressing an opinion is a disqualification, absolute and unqualified.

Under the former statute (of 1859) this court held that it was the court that should be satisfied that the opinion, founded on rumor, did not prejudice, etc., and not the person summoned as a juror. This decision evinces a disposition on the part of this court to restrict, rather than enlarge, the rule, even under that statute. And the legislature having struck out these qualifying provisions, leaving the ground for challenge simply and unqualifiedly the forming or expressing of an opinion as to the issue, or any material fact in the case, it is apprehended that this court will not now hesitate, in a capital case, where the candidate had formed and expressed an opinion which it would require evidence to remove, to hold that he was disqualified to sit as a juror in the case.

2. It was *error* to allow witnesses for the prosecution, whose names were not indorsed upon the information, to be sworn, under defendant's objection. The requirement of the statute is that the prosecuting attorney shall "indorse thereon

(on the information) the names of the witnesses known to him at the time of filing the same." See 1 G. Greene, 316; 4 id., 190. In the case at bar, where over forty witnesses were examined for the prosecution, and the names of only two appeared upon the information, there is a call if ever for an enforcement of the rule laid down by the statute. The witnesses thus objected to were the most important examined.

3. The court erred in admitting in evidence the entry in the book marked "Kansas Tribune," as a dying declaration of Ruth.

The evidence of the physicians, that Ruth could not have written while suffering under the symptoms described, is not contradicted. This, taken in connection with the fact as to the time required to write the document, uncontroverted, and it leaves the case with absolutely no evidence whatever that Ruth actually wrote, but with conclusive evidence that he did not write, the matter, so as to make it admissible in evidence as a dying declaration.

The contents of the paper having been admitted as a dying declaration, and for the purposes of a dying declaration—that is, to get before the jury the words contained in the memorandum-book as the dying statement of Ruth—the record must show it to be competent as such, or there is error. In *MacDougall v. McGuire*, 35 Cal., 274, it was decided that, "Where testimony is ruled out by the court for one purpose, but admitted for another, the jury can only consider it for the purposes for which it was received." Now, if the entry is tested by the authorities it will be found that it is not a "dying declaration," and that it was inadmissible as such: 1 Phil. Ev., 5, 15, 211, 212, 289, 290, 293; 2 Rus. on Crimes, 752; 31 Ind., 198. The authorities all assume that the declaration, to become competent evidence, is made in the hearing of *some one present at the time of its delivery*, who can swear as to what was said, the circumstances under which the declaration was made, the state of illness, and the competency of the deceased to testify, if alive, and as to his *manner and deportment*. The situation of the party—the

circumstances under which the declaration is made, are the very matters that take the place of the oath. Without a showing of these circumstances there is no showing of that which is equivalent to and takes the place of an oath.

Our constitution and laws give the person accused of crime the right to confront the witnesses, and thus, impliedly, the right to cross-examine them. The admission of dying declarations is an infringement upon these rights, and but for the fact that the defendant *has* a right to be confronted with the witnesses who testify to the fact of the actual making of the declaration, and the circumstances which take the place of and are equivalent to an oath, the admission of such declarations in evidence would be contrary to these constitutional provisions and an infringement upon these constitutional rights. It is on this very ground that this class of evidence is held to be admissible at all: 1 Phil. Ev., 296, note 3. The defendant cannot be deprived, not only of the opportunity to cross-examine the deceased, who makes the declaration, *and also* the witnesses who testify to the fact that the statement was actually made, and to the circumstances under which it was made, without infringing upon his constitutional rights.

Certain matters of competency, doubtless, may be shown by the declaration itself, but not the *preliminary facts* upon which is based the right of the court to examine the declaration for the internal evidence of its competency. Before the judge could examine the declaration at all the evidence ought to have shown, conclusively, that the declaration was a part of the *res gestæ*. 1 Phil. Ev., 298; 16 Ala., 672. Declarations, to become a part of the *res gestæ*, must have been made at the time of the act done, which they are supposed to characterize.

This doctrine is fully recognized by this court in *The State v. Montgomery*, 8 Kas., 351; also, see 1 Park. Cr. R., 556; 24 Pick.; 242. To prove the declaration part of the *res gestæ* in the very nature of things resort could not be had to the declaration itself.

There is no testimony showing *when* the entry was written; by *whom* it was written; and if by Ruth, his feelings, purposes, thoughts, or words at the time of writing, are not shown or attempted to be shown by any one who was present and had the means of knowledge. In fact, no time anterior to the death of Ruth is fixed by the testimony when the entry ·in question *was not in the memorandum book.* The evidence shows that it was not discovered until long after death had actually occurred, and after the dead body was discovered. The court was left to conjecture at what time prior to its discovery the entry was actually made.

To entitle the declaration in question to be read in evidence *as ·a dying declaration,* as was done in this case, in addition to the facts necessary to be shown to make. the act of writing a part ·of the *res gestæ,* the record should show that the declaration was "made under the *present* apprehension of impending death;" made in extremity, when the party is at the· point of death, and every hope in this world is gone; made by the deceased "when he was fully conscious of the fact that he would *surely die,* not as a thing of surmise and conjecture or apprehension, but as a fixed and inevitable fact." *Any hope of life, however slight,* in the mind of the declarant destroys the competency of the evidence as a dying declaration. On this point the authorities seem to be unanimous. 2 Russell·on Cr., 753; 1 Greenl. Ev., § 123; 1 Phil. Ev., 289; 2 Park. Cr. R., 246; 8 Ohio St., 131; 31 Ind., 147.

The memorandum is: "The doctor—I mean Dr. Medlicott—*gave* ·me a *quinine powder* Wednesday· night, April 26th." This is the narrative of a past transaction on ·its face. The narrative is certainly no part of the *res gestæ* of the administration of the powder. No evidence *dehors* this memorandum is given showing the declaration to have been made at the time or near the time of the actual giving by the doctor or taking by the declarant of this powder. This statement in the declaration clearly has its force by·itself as an abstract statement, detached from the then passing transactions, "depending for its effect upon the credit of the person making

it," and comes directly within the definition of hearsay testimony: 9 Cush., 36. It does not *prove* that a powder was given him, nor is it evidence as to *who* gave him the powder, for the declaration as to *who* gave the powder is in the *past tense.* It is the narration of an event already past, and therefore not a part of the *res gestæ.*

The entry itself does not on its face show *when* it was made. But if the entry contained a date it would prove nothing. The fact as to when it was actually made would have to be proved *dehors* the writing. But the entry *has no date.* The entry reads as follows: "The doctor gave me a quinine powder Wednesday night, April 26th." The year is not given. If it was, it would be no proof in the case. There is no evidence fixing the year anywhere in the case. It will be remembered in this relation that there was *no* time before the death of Ruth when it was shown that the entry was *not* in the book. The close of the entry is: "The clock has just struck eleven, and I took the *medicine about* 10.30 P. M." Here again no year is given. Besides, the entry on its face as to the "effects" of the "medicine" are mere matters of the *declarant's opinion*—not competent on that point—it being a question properly resting upon medical testimony in all cases. The entry is: "The doctor gave me a quinine powder Wednesday night, April 26th. The effects are these: I have a terrible," etc. This is an opinion squarely expressed that the *effects* of the quinine powder are as he describes the symptoms. Were the deceased alive and put upon the stand he would not have been *competent,* so far as the record shows, to give the opinion. Every person is not presumed to be competent to give in evidence an opinion as to the effects of a medicine on the human system. This question of competency in the witness was one addressing itself peculiarly to the judge as one of the preliminary facts to be proven before the evidence is admissible to the jury.

The entry on its face shows that *all hope of life was not gone.* It shows that death was problematical only—doubtful—not certain, at all events. The language is: "I write this so

that *if I never see you again* you may have my body examined and see what the trouble is." The writing carries the idea simply that *if* he *should* never see Mrs. Ruth again—an expression that implies merely *doubt* and futurity—then that the statement may be useful in the discovery of the reason. It *says* nothing about *death;* the words are, "if I never *see you* again." It requires to be *aided by inference,* to make it refer to the death of Ruth. That he believed that death was surely pending and imminent when he wrote, is a fact that cannot, even by inference, be supplied.

The entry is vague and indefinite as a reference to the *cause of death.* It requires inference to aid it, in that it says the doctor gave him a *quinine powder.* There is a large amount of testimony in the case that *quinine* might have had much to do with causing the death of Ruth. Quinine is not commonly understood to be a poison. The theory of the prosecution is, that the death was caused by *poison.* As a reference to the cause of death on this theory, the declaration requires to be aided by inference, or supposition, that the word quinine *meant* poison, atropine and morphine. If it was merely a quinine powder that caused the death, the declaration does not tend to criminate the defendant.

This entry is shown by the record to have been admitted to the jury as a *dying declaration* made *in extremis.* This was equivalent to a charge to the jury that the statement was made without a hope in this world, and was to be received by them and considered as though given under the solemnities of an oath, as though the deceased had appeared personally upon the stand and made it before the jury. If admitted to have any less effect, then it should have been accompanied by pertinent instructions. The decision of the judge on the admission of dying declarations, "as in the case of admitting facts, words or acts, as a part of the *res gestæ* is reviewable. 9 Cush., 36; 1 Kas., 496. It is a rule prescribed by statute that the court "must state" to the jury, "all matters of law which are necessary for their information in giving their

verdict." Gen. Stat., 858, § 236. With reference to the point at issue, the court was asked to charge as follows:

" 22. When the statements of a person are offered in evidence, as his dying declarations, the proof must clearly show that the declarant was in fact at the very point of death, and that he was fully conscious of that fact, not as a thing of surmise and conjecture, or apprehension, but as a fixed and inevitable fact. It is not that *these* facts and circumstances create a probability, though a strong one, and if therefore, assuming all *the facts* to be true, which *the evidence* tends to establish, they may yet be accounted for on any hypothesis which does not include the guilt of the accused, then the proof fails to make out the charge. It is essential therefore that the circumstances taken as a whole, and giving them their reasonable and just weight, and no more, should to a moral certainty exclude every other hypothesis."

The court here was asked, directly, to give a charge touching upon the bearing of *facts* that give the class of evidence under consideration, weight—the facts, constituting the circumstances under which the declaration was made. It was error for the court to refuse to give the first clause of this charge—a striking out of which, destroyed the application of the whole charge to the evidence intended, for the facts and circumstances are the very essence of the testimony *as testimony.* The fact that the same circumstances are the basis for the admissibility of the evidence does not aid the matter; nor was the error cured by giving the last clause quoted above, for without the first above-quoted clause, the latter would be applied to other and very different " facts and circumstances " than those intended.

The court was also asked to charge, relative to this point in issue, as follows:

" 50. The jury are instructed that if from the letter of Ruth, found in the book marked ' Kansas Tribune,' you can reasonably draw the conclusion that Ruth committed suicide, you must acquit the defendant.

" 52. The prosecution is bound by the statement in the letter of Ruth, found in the memorandum book ' Kansas Tribune,' as to the kind of powder the deceased received from the defendant."

Both of which the court refused to give. Both of the charges asked and refused are good law, applicable to the case. They have a direct bearing upon the weight to be given to the evidence. The latter is good because there is an utter absence of proof showing that Ruth referred, in the writing, to any other powder than what he named—quinine—or meant any other. The fact that he did mean quinine and nothing else, is supported by the testimony *dehors* the statement that quinine powders were actually left by the defendant with deceased, to be taken by him—were present in the room when he died. And the fact that poison was found by the analysis to be in his stomach, (if that fact exists, which is not conceded,) does not support the idea that the prosecution have shown what Ruth stated to be quinine, was actually something else, because there is no proof whatever that the statement of Ruth was made after he had taken the poison that was found in his stomach, nor that that poison was what Ruth took as quinine. The failure of the proof showing when the writing was made, leaves the law applicable to the case as requested to be given in No. 52 of the charges asked by defendant and refused.

4. The court erred in its rulings in admitting and rejecting the testimony of experts. [Fourteen pages of counsels' brief are devoted to a statement and discussion of the testimony given by the medical witnesses, and similar testimony offered and rejected, and of the law governing the admissibility of testimony involving the opinions or judgment of witnesses upon questions of medicine, science, skill, etc. Being unable to abbreviate it, the reporter is obliged to omit it. See note, ante, p. 258.]

5. The court erred in the instructions given and refused regarding the testimony of the experts, and the cause of Ruth's death. The appellant asked the court to charge as follows:

"32. The jury, in considering whether Isaac M. Ruth came to his death by poison, cannot consider any relation whatever the defendant may have had with the wife of the deceased.

"33. And the jury, in considering as to the cause of the death of Isaac M. Ruth, must not consider or allow the motives of the defendant with Ruth's wife to influence their decision on that point."

These charges the court refused to give, but on request of the prosecution, charged that—

"The medical testimony alone is not all the jury may take into consideration in determining whether Ruth died from the effects of poison administered by the prisoner, but the jury may take *all the circumstances in the case*, including *the acts and words and writings of the defendant*, in determining that question."

This implies that the jury *may* consider the "medical testimony" in determining whether Ruth died "from poison administered by the prisoner," and it assumes that the poison found through the "medical testimony" was "administered by the prisoner." This assumes a fact not proved. There is no "medical testimony" in the case that in the slightest degree bears upon the question *who* administered the poison (if poison was administered,) nor that the prisoner did, nor that in any way connects the prisoner with the death of Ruth, or with the substances found within his body. This was error. The charge is bad, on the ground that it treats as one inseparable question two distinct propositions, the cause of Ruth's death and the administration of poison by the defendant, and declares that the medical testimony bears upon this joint question. It was error also to refuse the charges (Nos. 32 and 33) asked by appellant. By these charges the defendant sought to have the court instruct the jury to consider the question of the *cause of death* separately from the other questions that might arise. In the nature of things a consideration of defendant's relations with Mrs. Ruth could not throw light upon the question whether poison was found in Ruth's stomach or not. These charges were requested *on the assumption* that an analysis of the body of Ruth ought to have been made and had actually been made, and that such a course was requisite to determine with certainty the cause of death. The assumption is one shown to be *a true and safe one by the*

*testimony.*    The witnesses for the prosecution, without the analysis, were unable to say that *poison* caused the death.

The court also erred in its general charge to the jury. Paragraph 61 of such general charge, relating to the discovering the existence of vegetable poisons, is not law, and was clearly prejudicial to appellant.    (24 Cal., 14.)    The first clause of said paragraph is a direct charge of facts.    It was error to give such an instruction as *law* in the case, which the jury are bound to follow; and its fatal effect is not cured by a proper charge of the law in the case in other parts of the charge.

6.  A person was brought, by the prosecution, from out the jail of Douglas county, and placed on the witness stand, under the name of Henry Johnson. ˙ This witness is shown by the record to have been incarcerated for grand larceny and burglary.    He was placed in the same cell with defendant. He alleges that he gained the confidence of defendant.    The pertinency of this is apparent when the witness swears that he gained this confidence by deceit and lying, and *with intent, from the beginning, to betray* the defendant.    He partook of the bounty of defendant, as he swears, and then divulges the results of his companionship by day, and his vigils by night, against him.    This witness, from his own evidence, as a companion, proved prolific in suggestions and plots, and, as a spy, he surely shows himself a facile tool of the prosecution — being *under its direction completely,* being liberated, without bail, as necessity required for his investigations.    That this servile person was induced to perform the work, the record shows he did, for the prosecution, with the *belief* at least, that he was thereby earning exemption from a trial for the crimes he was charged with, is a fact that no one can read this record without recognizing and believing.    Testimony procured by such means is very rarely admitted in a court of justice. ˙Its admission, under all the safeguards the law can place around it, is abhorrent to the finer sentiments of mankind, and to the better notions of public policy.    A court, determining to admit

the testimony of such a witness, under the circumstances of this case, ought to have rigidly restricted the same to the issuable facts in the case—ought not to have allowed the witness to state any matter not absolutely and unqualifiedly competent in the issue beyond any doubt, and ought to have accompanied the same with appropriate instructions.

In singular contrast to these well-recognized and reasonable doctrines the prosecution was allowed, if not encouraged, by the court, to show by this witness, from *incomplete fragments of conversation* had with defendant, matters that had no connection with the case on trial, by any possible construction. But the mischief in the case of the witness Johnson did not stop with the admission of his testimony. It was not (seemingly) enough that his story should go to the jury for what it was, unaided, worth; but the prosecution conceived the necessity of bracing it up with charges from the court as to its effect. They asked, and the court gave, under the objections of defendant, the following, among the charges asked by the prosecution:

"3. In the prosecution of the public business it is the right of the prosecuting or county attorney to call as a witness any man in the county jail, to employ him if he so desires as a spy or detective; and the fact that such witness is charged with crime *is no evidence* against such witness' character for truth and veracity, *and his testimony is to be judged of as that of any other competent witness.*"

The "ear marks" on witness Johnson, his employment by the prosecution while in jail as a spy, he being charged with crime, are so prominent that there is no mistaking that this charge means him alone. It is applicable to no other witness. Applied to him, this charge was error. His testimony, in part at least, tended to establish the attempt to commit by defendant, together with the witness, the crimes of arson and jail-breaking. From his evidence this witness proved himself *an accomplice* in these crimes. He was to be *the principal actor* in their commission. His evidence then as to these matters, if competent at all, was *not* "to be judged of as that of any other competent witness."

It is a rule that a party to an action may fortify his case by pertinent charges referring to particular parts of evidence, or to particular witnesses. This rule was sought to be applied by defendant to the same witness, Johnson. The defendant asked the court to charge as follows:

"If the jury believe, from all the evidence, that the witness Henry Johnson has willfully and knowingly testified falsely in respect to any material fact, then it is their duty to disregard the whole of his testimony. The presumption that the witness will declare the truth ceases as soon as it manifestly appears that he is capable of perjury.

"If the jury believe from the evidence that the witness Johnson has been successfully impeached, they must put no reliance in his statements that have for their support his own evidence alone."

Instead of giving the law in a manner that it might be applied directly to this witness, the court in his general charge so framed his instructions as to make this law applicable mainly if not solely *to the defendant,* who was put upon the stand in his own behalf. The charge reads:

"The evidence of the person on trial, given in his own behalf, under and by virtue of the statute laws of this state, should be subjected to the closest scrutiny, for it is hardly to be conceived that a stronger incentive to commit perjury exists than that which would induce one actually guilty of an infamous crime to shield himself from the penalties of the law, especially when the punishment was of a very serious character. In such a case the danger of detection and the risk of temporal punishment would have little effect. A general rule, applicable to all witnesses, is, the presumption that a witness will declare the truth ceases as soon as it manifestly appears that he is capable of perjury; and when a witness knowingly testifies to that which is false in a material matter, it is the duty of the jury to disregard the whole of his testimony, for then the maxim, 'False in one thing, false in all things,' applies."

This was practically a refusal by the court to apply this law to the testimony of the witness Johnson, but applying it in the strongest terms to the defendant; at the same time couching the language in such technicalities as to make it, in case of necessity, applicable to all witnesses, yet by its rela-

tion as to what preceded and as to what followed, leading the jury to apply it to the testimony of defendant alone. The only question is, whether the court has, in a manner required by the statute and by his duty, given the law upon this question. The rule is that a court is not bound to charge the jury upon a proposition of law involved in the case, which in his charge he has once *fairly* submitted to them. It is insisted in this case that this law asked has *not* been *fairly* given to the jury.

7. Another important fact showing the inconclusiveness of the testimony, that the crime of murder was committed, is this: the traces of disease *were* discovered six weeks after the burial of the body. The lungs were very much congested, and this alone was enough to produce death.

If a poisonous dose of morphine *was* taken, the presence of quinine powders, in medicinal doses, and morphine powders (similar in appearance) in poisonous doses (for external application,) in the same box in the stand-drawer in Ruth's room, as clearly shown by the testimony, taken with the fact that men are liable to make mistakes, leads to a theory of the cause of death more consonant with the other facts in the case, more rational, more in the nature of things, than is the theory of murder.

The writing of the "declaration"—*the omission to call for aid*—can as well be accounted for on the theory of *mistake* as on that of crime. This theory of mistake accounts for the statement in the "declaration" that it was a *quinine* powder taken. It as well accounts for the *doubt* expressed in the declaration as to whether the declarant would ever see Mrs. Ruth again. The presence of the powders—Ruth's previous habit of taking, and then present intent to take, a quinine powder out of the very drawer where were poisonous doses of morphine, wrapped in similar papers in the same way as quinine powders, far more surely prove a taking of poison by mistake, than the circumstance that the defendant played chess with him during that evening proves that a crime was committed. That Ruth in the declaration, intended to carry

18

the idea that defendant, on that evening, actually gave him a quinine powder, is not reasonable. That would be the form of expression natural, in case he meant merely that he had *taken one* of those *prescribed*—one of those from the drawer. The actual offering by defendant of *another* quinine powder from those already in the drawer while those were on hand, would have been a proceeding unreasonable in the nature of things, unusual in the practice of physicians—and calculated immediately to arouse inquiry in Ruth's mind. This theory cannot be entertained in the presence of another so much more consistent and reasonable, viz., the theory of mistake. This and the theory of the cumulative effects of quinine completely explain every fact adduced by the prosecution to support the theory of Ruth's murder. All the evidence could be reconciled, without the presumption that the defendant was guilty. It was the duty of the jury to give full weight to the presumption that he was innocent.

8. The novel charges requested by the prosecuting officer as a judicial indorsement of his conduct, as they had been given by the court as matters of law which the jury were bound to consider as having a bearing upon the question of the defendant's guilt or innocence, as they contain manifest error, the possible effect of the latter ought to have been cleared away by the granting of a new trial. Did the charges relate to the *testimony* of the attorney as a witness in the case, the proceeding would be less striking, for he was on the stand no less than half a dozen times; but they do not. The asking of charges from the court sustaining the course pursued by any attorney is a proceeding unknown to the history of jurisprudence in this or any other country. The consideration that the life of a human being is at stake, it is believed will not be lost sight of, and will have its proper bearing in the determination of the question whether a new trial ought to have been granted.

A. L. *Williams*, Attorney-General, *John Hutchings, Thos. P. Fenlon,* and *C. B. Mason,* for the State:

1. With reference to challenge of jurors, a man can only

be challenged when he has formed or expressed *an opinion on the issue*, on some *material facts*. The record plainly shows that the jurors had simply formed an impression on newspaper articles, and nothing akin to a deliberate *opinion* on the issue or on any material fact. 4 Parker Cr. R., 71; 53 Ill., 311. But the jurors were challenged peremptorily by the defendant, and no attempt was made by defendant to challenge more than nine additional jurors, and he cannot now complain that he did not have three more challenges, for he did not demand them at the trial. In any view of the matter it is but purely technical, and could not possibly have affected the substantial rights of the defendant. Crim. Code, § 293, p. 867, Gen. Stat.

2. The objection that the names of the witnesses were not on the information, is effectually disposed of by § 293 Crim. Code. By no possibility could the defendant's substantial rights be affected by the fact of all the names not being on the information. The prosecuting attorney is required to indorse the names of *other* witnesses "at such time as the court may prescribe." The court made no order on the prosecuting attorney in this respect; but the question is settled by *State v. Dickson,* 6 Kas., 209.

3. Whether the written statement in the book marked "Kansas Tribune" was a dying declaration was a question in the first place for the presiding judge, "it being his province, and not that of the jury, to determine that question." 1 Greenl. Ev., §§ 160, 161*a*, 161*b*, 162; 16 Ala., 672; 11 Georgia, 353. These authorities abundantly show what it hardly required authority to establish, the proposition that whether or not the declaration was made under a sense of impending death was a fact which might be established by circumstantial as well as direct evidence. In truth, it seems that there can be none other than circumstantial evidence to establish this fact. In the case at bar what are the circumstances? Ruth was a healthy, happy, contented man as late as nine or ten o'clock of the night of 26th April, 1871; the next morning as early as eight o'clock he was

found in his bed with the bloody froth or serum issuing from his mouth—striking evidence of sudden death by poison. The writing was then found near his dead body, in which he says the defendant gave him the medicine on Wednesday night, 26th April, and describes the symptoms, directs that his body may be examined, says his last thoughts were of his wife, and prays to meet her in heaven. Can any reasonable man view the testimony that was adduced in this case before the declaration was permitted in evidence, and come to any other conclusion than that the letter was written the night of his death—was concluded when no hope remained to him? That species of testimony which universally convinces the intelligent mind of the fact alleged ought to be good evidence. 7 Iowa, 288.

In *Campbell v. The State*, 11 Geo., 353, the court used this language: "When the evidence is contradictory as to whether or not the declarations were made with the consciousness that the declarant was *in articulo mortis*, the court will not interfere with the verdict of the jury and grant a new trial, especially when it is satisfied that the finding was warranted by the proof." The court will not fail to notice that Ruth's written declaration was not permitted in evidence till all the facts above referred to were in evidence, and the analysis of the vital organs and bladder of deceased had been shown, so that the court had all the circumstances before it when the paper was admitted. It was admissible as *res gesta*. 2 Parker, 84; 8 Wallace, 397.

4. A scientific witness having been placed on the stand by the defendant and asked questions of a scientific character, on cross-examination may be asked any question which may develop the extent of his scientific acquirements. This is the case in the matter of the cross-examination of Dr. Rice. 12 N. Y., 361; 7 Kas., 143. In *Tefft v. Wilcox*, 6 Kas., 58, this court distinctly and carefully makes the point that the experts were called and testified as such simply "without knowing the particulars of the case from personal observation," and gave their opinions as to matters of fact concerning

and assumed to exist in and constituting that particular case. Surely no two cases could be further apart; in this case witness Fuller had personally examined the lungs, heart, stomach, intestines, kidneys, liver and brain of Ruth, and was a scientific man; in the Tefft case the witness knew *nothing* from personal observation, and testified to facts constituting the case.   Wharton & Stille, § 94, and note; 1 Greenl., § 440.   In this case the witness had heard *all* the testimony concerning the chemical analysis, and was competent to give his opinion thereon as to cause of Ruth's death. 1 Wharton Cr. Law §§ 45, 46, and note "a."

5. The sixth head of appellant's brief is entirely taken up on the witness Johnson; that this witness was competent is beyond all question, and when we consider that his testimony is corroborated by every act, word and letter of the prisoner, we are not surprised at the bitterness exhibited toward him, and the anxiety to break him down.   He stood before the court with all the facts surrounding him plainly before the jury.   It was the sole pleasure and power of the jury to believe or disbelieve him, and the attempt to compel the court to make him infamous by instruction to the jury was not only not authorized by law, but in direct violation of every known principle in the trial of cases in courts of justice.   This man had the right to become, as he did, the friend of the state, in the unearthing of crime, and he deserves commendation and praise instead of curses.

The opinion of the court was delivered by

KINGMAN, C. J.: The appellant John J. Medlicott was duly charged with murder in the first degree by poisoning Isaac M. Ruth.   The information was filed in the district court of Douglas county, and was on change of venue moved to Anderson county, where a trial was had, resulting in a verdict and a judgment of guilty against the defendant, from which he appeals to this court.   Numerous errors are alleged, and the case has been elaborately argued in this court.   We proceed to decide such of the errors relied on as are essential;

and if the reasons given for our decision are not as elaborate as the arguments, it is not because we have not given anxious and careful attention to the questions raised, such as the gravity and importance of the matters in issue demanded, but rather because the great size of the record we have been compelled to examine most critically, and the great number of the questions presented and argued, have taken so much time that but little is left in which to give our reasons.

I. The first of the errors alleged, and the one first presented in the order of time on the trial, arose from the rulings of the court in the selection of jurymen. The facts are substantially as follows: C. R. Anderson was sworn, and in answer to questions by counsel for defendant stated that he believed he had formed an opinion on the issue to be tried, and may have expressed such opinion, and could not say it would not take testimony to change it. Counsel for defendant then challenged him for cause. Whereupon the court asked Anderson certain questions, in answer to which he stated that the opinion he had formed was based upon newspaper reports only; that it was an impression merely, and not an opinion, and was dependent on the truth of the newspaper account; that he had no knowledge whether that account was true or not; that the impression was not positive or fixed, but dependent upon the truth or falsity of the newspaper accounts. The challenge for cause was overruled. Very nearly the same state of facts was elicited in the examination of Thomas Newton as a juror, and the challenge for cause was overruled. J. A. Maghee, in answer to questions of defendant's counsel, stated that he had formed no opinion, but that he had a belief that would require testimony to change; could not say it was firmly settled; would wish to be satisfied as to whether his belief was right or not. And again, in answer to questions by the court, stated, that he had formed no opinion or impression as to the guilt or innocence of the accused, "only a belief." On what "the belief" was based does not appear. It would require testimony to satisfy

*1. Jurors— opinions— qualifications.*

him that his belief was wrong. This man was challenged for cause, and the challenge overruled.

Each of these jurors was challenged peremptorily, and the defendant having afterwards exhausted all his peremptory challenges was deprived of the right to three peremptory challenges if there was error in overruling his challenges of these men for cause. Our statute, criminal code, has made positive provision for the case, which is but a declaration of a principle generally recognized in the decided cases in other states. It is as follows:

"SEC. 205. It shall be good cause of challenge to a juror that he has formed or expressed an opinion on the issue, or any material fact to be tried."—Gen. Stat., 853.

The rule adopted by our statute has so frequently been the subject of judicial comment as to leave little room for useful extended observations. Although Anderson at first stated that he had an opinion, upon further questioning it appeared clearly that it was an impression only, and that impression depended on the newspaper account, of the truth of which he had no knowledge. We think there was no error in overruling the challenge for cause in his case. An impression is not an opinion, and is not made cause for challenge by the statute. It was claimed in the argument that the distinction attempted to be drawn between an opinion and an impression is technical, fine-drawn, and unfair, and seems not to be treated with great respect by the text-writers. Yet we find that the distinction has very generally been recognized by the courts, and seems to be founded in reason. In one of the earliest cases, and one very generally referred to, the juror stated that he had frequently thought and declared the defendant guilty, if the statements he heard were true; that he did not know whether they were so, but only thought from the great clamor which had been made that it might be possible they were true; that he had no prejudice for or against the defendant. He was admitted as a juror, Chief Justice Marshall observing, that "light impressions, which may be supposed to yield to the testimony that may be offered, which

may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them, which will combat that testimony, and resist its force, do constitute a sufficient objection to him." 1 Burr's Trial, 416. Tested by these conditions, and we cannot say that Anderson was not a proper juror. There is nothing to show bias or prejudice. There was no opinion formed. He had read about the case in the newspapers, and what he had read had made some impression, but not such as to prevent his judgment from being governed by the testimony in the case, and giving to it a fair and just consideration. In these times it would be difficult to find men fit to sit upon a jury who had not some impression as to the case, derived from newspaper accounts, where the alleged crime was of such a character as to challenge the attention of the public. As was observed by Cooley, J., in *Holt v. The People*, 13 Mich., 224, "To require that jurors shall come to the investigation of criminal charges with minds entirely unimpressed by what they may have heard in regard to them, or entirely without information concerning them, would be in many cases to exclude every man from the panel who is fit to sit there." With the present means of information, the facts or rumors concerning an atrocious crime are, in a very few hours, or few days at the farthest, spread before every man of reading and intelligence within the district from which jurors are to be drawn; and over the whole country, if the atrocity be especially great. And there are some crimes so great and striking that even the most ignorant will have information and impressions in regard to them; and the rule as stated, applied to such cases, would render the impanneling of a jury for their trial "impossible, and make their very enormity a complete protection from punishment." So in this case, the impression that the juror had received from the reports in the papers did not indicate a state of mind that would preclude an impartial examination

of the facts when presented in the form of legal testimony. It is admitted by every one that an impartial jury is imperative; but impressions, slight and fugitive in their character, such as every one forms from reading the daily press, on nearly every crime that is committed, cannot be held as rendering such persons unfit for jurors; otherwise only the most ignorant would be admitted to the jury-box, a result not desirable, and most dangerous to those charged with crime, and who are not really guilty. It is admitted that the authorities on this point are not harmonious. Sustaining the decision, reference is made to *The State v. Potter*, 18 Conn., 166; *Smith v. Evans*, 4 Ill., 79; *Gardner v. The State*, same, 85; *Leach v. The People*, 53 Ill., 311; *Stout v. The People*, 4 Parker's Crim. R., 71; *The State v. Kingsbury*, 58 Maine, 238; *Morgan v. The State*, 31 Ind., 193. The challenge as to Thomas Newton depends upon a state of facts so similar to that just decided that nothing further need be said.

Maghee's position was somewhat different. He had formed no impression or opinion, but had "a belief" as to the merits of the case. Now, whether a belief may or may not be stronger than an opinion, is a question we need not decide, for it is apparent to us that Maghee considered his belief as more evanescent and less fixed than either an impression or opinion, and it is the condition of his mind as to the matter at issue that we are to determine, and not the accuracy of the terms that he used. In this view he was a good juror. We do not intend to say that a belief would not in any case be a good cause of challenge, because in most cases where correctly used in such a connection the term indicates a persuasion of the mind to the truth of a proposition founded upon evidence, and might not only include opinions, but go much farther than that word indicates; but as this man had no opinion we must infer, as we do from the whole examination, that he used the term as showing a much weaker condition of his mind as to the issues to be tried than the word opinion signifies. The court correctly overruled the challenge to this juror for cause.

II. The second error alleged is the ruling of the court, allowing witnesses for the prosecution whose names were not indorsed upon the information to testify over defendant's objection. This point was settled in the case of *The State v. Dickson*, 6 Kas., 209, and there is nothing in this case to make it an exception to the ruling therein made, and on the authority of that case it is decided that the court ruled correctly.

*2. Witnesses; names on information.*

III. The next error alleged is the admission in evidence of the entry in the book marked "Kansas Tribune," on pages 18 and 19, as a dying declaration of Ruth. It was in testimony that the wife of deceased had on the 26th of April gone to Leavenworth; that the book was found among the clothing of deceased, lying upon his coat on the piano; on the coat and book was his vest, and on his vest was his pantaloons. The book was found with the tongue of the cover tucked under the loop, in the situation described, on the morning Ruth was found dead, the 27th of April 1871. The writing on pages 18 and 19 was proven to be in the handwriting of Ruth, and the book identified as belonging to him. It was written with a pencil, and is as follows:

*3. Dying declarations; writings, etc.; admissibility.*

"DARLING: The Doctor—I mean Dr. Medlicott—gave me a quinine powder Wednesday night, April 26. The effects are these: I have a terrible sensation of a rush of blood to the head, and my skin burns and itches. I am becoming numb and blind. I can hardly hold my pencil, and I cannot keep my mind steady. Perspiration stands out all over my body, and I feel terribly. The clock has just struck eleven, and I took the medicine about 10.30 P. M. I write this so that if I never see you again you may have my body examined and see what the matter is. Good-bye, and ever remember my last thoughts were of you. I cannot see to write more. God bless you, and may we meet in heaven.

"Your loving Hubbie,          I. M. RUTH."

It has been shown that this letter was written by Ruth in a book which he usually carried with him. We will assume that it was sufficiently shown that it was written on the night of Wednesday, the 26th of April 1871; but the question

remains, was it written under such circumstances as authorized it to be read as evidence? While the particular circumstances of this case are novel, and no precedent is found presenting the same peculiarities, still the principles on which it should be admitted or rejected are "well defined, marked and clear, founded upon a plain reason, and sustained by uniform authority." It is a general rule that testimony must be given under the sanctity of an oath; that it must be of facts of which the witness has knowledge, otherwise the testimony is rejected as hearsay. An exception is made to this rule as to declarations, called in the law-books, "dying declarations." In such cases certain rules are laid down with such exactness as to leave little room for mistake, and wherever there has been a mistake the error has arisen, from a misapplication of the law to the facts, rather than from any misunderstanding of the principles that control the admission of the testimony. These rules have been adopted to guard against the manifest danger to human life that is so liable to arise from the admission, as evidence, of declarations not made under the sanction of an oath, and not offering to the party to be affected by them an opportunity of cross-examination, or to call attention to omitted facts, that if stated might modify or completely overturn the inference drawn from the declarations as made. / Such declarations therefore are admissible only where the death of the person who made the declaration is the subject of the charge, and where the circumstances of the death are the subject of the dying declaration. They are admissible only where the person making them is *in articulo mortis*, and in the full belief that he is about to die./ It may be affirmed that no well-considered case has varied from these rules, and that the tendency is to greater stringency, rather than to any relaxation in applying them to cases. It is the last point in the rules indicated that is most important in this case, in the view we have taken of it, and reference is here made to a few of the leading cases thereon, and brief quotations made from them, as illustrating

the rule by the remarks of eminent judges who have had occasion to apply the rule:

"Dying declarations are made in extremity, when the party is at the point of death, and when every hope of this world is gone, when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth; a situation so solemn, and so awful, is considered by the law as creating an obligation equal to that which is imposed by a positive oath, administered in a court of justice." Ch. Justice Eyre, in *Woodcock's case*, 1 Leach, 502.

In a very recent case the decision shows the care which courts should exercise in admitting such testimony, and the judge who delivered the opinion said: "Dying declarations ought to be admitted with scrupulous, and I had almost said with superstitious, care. They have not necessarily the sanction of an oath; they are made in the absence of the prisoner; the person making them is not subjected to cross-examination, and is in no peril of prosecution for perjury. There is also great danger of omissions, and unintentional misrepresentations, both by the declarant and the witness, as this case shows. In order to make a dying declaration admissible there must be an expectation of impending and almost immediate death from the causes then operating. The authorities show that there must be no hope whatever. In this case the deceased said originally 'she had no hope at present.' The clerk put down that 'she had no hope.' She said in effect when the statement was read over to her, 'No, that is not what I said, nor what I mean. I mean that *at present* I have no hope,' which is, or may be, as if she had said, If I do not get better I shall die." All the court were of the opinion that the evidence was inadmissible. *Regina v. Jenkins*, Law Rep., 1, C. C. R., 191.

"No matter how strong the expression of the certainty of death may be, if there be any evidence of hope in the language or actions of the declarant his statements will be rejected." *Morgan v. The State*, 31 Ind., 199.

"Testimony of this character is only admitted from neces-

sity, and an abuse of it is guarded against by the law with most minute particularity.  There is no one principle better established than that such declarations shall not be received unless the proof *clearly* shows that the deceased was *in ex-tremis*, (perhaps the words *in articulo mortis*, which are used by some of the authorities to express this condition, are more accurate,) and that he or she at the time of making them was fully conscious of that fact, not as a thing of surmise and conjecture, or apprehension, but as a fixed and inevitable fact." *Smith v. The State*, 9 Humph., 9.   See further on this subject, 1 Phil. on Ev., ch. 7, § 6, and 1 Greenl. on Ev., §§ 156, 157, 158; *Campbell v. The State*, 11 Ga., 351.

Such are the decisions on the admission of this testimony. Admitting as we do that it was made apparent that this letter of Ruth was written on Wednesday night, the 26th of April 1871, and that on the next morning he was found dead in his bed, and conceding that it was sufficiently proven that he died of poison, is it satisfactorily shown that when he wrote he was fully aware that the hand of death was on him?  If so, it must appear from the letter itself, for all the extraneous evidence that was admitted both before and after this letter was read tends to show that he was not without hope.  In the next room was his step-son, a youth fifteen years old. The house was surrounded by inhabited dwellings.  At quarter before eleven the witness Apitz saw him sitting in his room apparently in pain, with his vest and pants on, which were found in the morning arranged in an orderly manner on the piano.  These facts were in evidence when this letter was offered in evidence.  Other facts appeared after its admission, which the judge could not know or take into consideration then, and not to be considered now, but which we may notice hereafter.  The only testimony then that in any way shows the condition of Ruth's mind to be such as to authorize the admission of the writing must be drawn from the writing itself, and the facts above stated.  For this purpose the court could examine the writing, but with no better opportunities or facilities for arriving at a conclusion than

this court has./ Does the writing "*clearly show*" that when it was written the writer had lost all hope of life?/ Ruth was not a well man, and this fact is apparent from his taking medicine. Some ailment was troubling him. When he wrote it is evident that he had grave suspicions, that they were strong enough to induce him to take such precautionary measures as would lead to an examination if his suspicions should prove correct, and at the same time would leave within his control the evidence of his suspicions if they should prove groundless. His sufferings were evidently great. He was not able to account for them; his fears were aroused; horrible doubts filled his mind, adding to the tortures he was suffering from the pains in his body. So much we may infer. But we look in vain for the *clear* evidence that hope had fled. "I write this so that *if* I never see you again you may have my body examined and see what the trouble is." This is the reason he has left us why the memorandum was written. The language indicates *doubt*, and provides for a contingency, not a certainty. Why did he not call to his step-son, who was sleeping in the next room, and within a few feet of him? Such a course would seem the most natural one, as he could talk freely with him, with less trouble and inconvenience than was possible in the method he pursued. It is left to conjecture; and it is possible that should he do so, and in the morning find himself well, it would place him in a somewhat ridiculous position, while the course he did take would cause inquiry if his suspicions should prove well founded, and would avert ridicule if his fears were needlessly aroused. But this is speculation. The operations of Ruth's mind at that time must forever remain unknown to us, as well as its condition; and this is the reason why the writing was inadmissible as a dying declaration. It is suggested that the memorandum shows on its face evidence of failing strength in the writer. A photograph of the letter is attached to the record, and it is not very clear that any inference can be drawn from the chirography. The last sentences are less plainly written than the first. This may result from many

causes, and it may be the result of failing strength. But it in no way indicates the condition of Ruth's mind. To those who see in it the signs that the hand of death was upon him, it must still be silent as to the hope or despair that filled his mind. Again, it is said in argument, that "that species of testimony which universally convinces the intelligent mind of the fact alleged ought to be good evidence." To this statement we give a hearty assent; but it is not the province of a court to admit such testimony except under the sanction of an oath, and subjecting the witness to the risk of the pains and penalties of perjury, and also bringing him face to face with the accused so that he may have the benefit of a cross-examination. These rules have been found so essential as safeguards in the investigation of truth that they have become fundamental in our system of jurisprudence, and some of them have been placed for greater security in our constitutions. No matter how convincing the testimony may be to the "intelligent mind," unless it can be presented under fixed rules it cannot be received. So in this case. The rule is established; judicial decisions have fixed the terms upon which dying declarations can be received, and those rules are such as wisdom and experience have suggested as most conducive to the safety of society and the protection of its members.

So far we have considered the case upon the facts in evidence at the time the memorandum was admitted in evidence. Subsequent testimony in the case tends very strongly to support the conclusion previously arrived at. Not only does it appear that the step-son of deceased slept within easy call in the adjoining room, with other children of the family, a youth to whom he had spoken kindly at bed-time, but that Ruth had caused a child that usually slept with himself and wife to be removed at bed-time to the room with the other children, and had caused a lap dog that always slept in an easy chair in the room of deceased to be removed from the room that night. In the morning the door between the rooms was found locked with the key on the side of the door

in Ruth's room. It also appears that deceased had locked this door after Dr. Medlicott had left, and after he had bidden his son good-night. It also appeared that Dr. Rice slept in his house that night with his windows open towards the house of Ruth, from which it was distant ten feet; that from his liability to professional calls at night he was very susceptible to any alarm at night, and that he heard no call of any kind. Surrounded by these facts why did the deceased make no call for help? The witness Apitz, whose house was but twenty-five feet distant, entered his yard about quarter hour before eleven that night, went close to the window of Ruth's room, looked in, and saw him apparently suffering. He remained near the window about five minutes, and thinks he heard deceased groan. The slightest alarm would have brought instant assistance, and possibly absolute relief. It is incred-ible that deceased should have felt a certainty that he was in immediate peril of his life, and not have sought assistance when he knew it was so easy to get it. It is not the way men act when they feel that they are dying. They want not only aid, but sympathy. They require the kindly acts of their fellows, and those kindly feelings elicited by such circumstances from all mankind. On a motion for a new trial all these facts had appeared, and on that motion were proper to be considered. It is not necessary that our reasons should be such as to convince all minds. If it leaves the question in such uncertainty that intelligent men may differ about it, then there was surely no such *clear* showing that Ruth believed he was dying when he wrote the memorandum as to authorize its admission as a dying declaration. We have reached our conclusions in this case upon the theory of the prosecution that Ruth came to his death by poison. But whether that is so or not, or whether the poison was administered by another, or taken by himself, are questions upon which we do not feel called upon to express our views. As the case must be retried it would be unwise to do so.

IV. Other objections were taken to the admission of testimony, some of which require notice. Dr. Rice was called as

a witness for the defense and testified as to his qualifications

**4. Opinions of witnesses; experts.** as a physician, as to the proximity of his residence to that of the deceased, the relative location of the windows of the two houses, that he was at his house the night of Ruth's death, and heard no call for help. He testified as to the symptoms following the administering of certain drugs, and as to the symptoms described in the book marked "Kansas Tribune," and upon these points only. On his cross-examination he stated that he had not heard the testimony of all the physicians who had testified as to the facts of the case. He was then asked the question, "From the medical testimony which you heard, and the statement of these symptoms, what in your opinion caused the death of I. M. Ruth?" This question was objected to, and answered over the defendant's objection. The answer was, "An overdose of morphine," by which he explained he meant a poisonous dose. It does not anywhere appear what part of the medical testimony he had heard. The testimony is manifestly improper. It was drawing a conclusion from a part of the testimony, and this is never allowable. There is some conflict in the authorities as to whether it is ever proper to permit a witness to draw an inference from the testimony, when he has heard it all, but the weight of the authorities seems to be that he may testify as an expert if he has heard all the testimony in the case, on the point to which the question is directed; but whether such a course is permissible, or the opinion of the expert must be shown by hypothetical questions, the course pursued in this case is equally objectionable. But it is claimed that in cross-examination such latitude is allowable to test the intelligence of the witness. The fallacy of the reasoning is obvious. Neither the court, nor the jury, nor counsel, knew on what part of the medical testimony the opinion of the witness was founded, therefore the answer formed no criterion of the intelligence of the witness, or his capacity to form a correct judgment. Had it appeared what part of the testimony the witness had heard, there would have been some plausibility

in the argument; but as the question was asked it afforded no basis whatever. It would be as sensible to test a person's knowledge of mathematics by asking him the sum of two and an unknown quantity, at most known only to himself. The case of *The State v. Reddick* is referred to by counsel as authority to support the ruling of the court on this question; but there is a total misapprehension of the decision in that case, or it could not be claimed as sustaining the admission of Dr. Rice's testimony. In *Reddick's case* a definite hypothetical question was asked of the witness on his cross-examination, and his opinion sought as to the sanity of the deceased in the facts as stated in the question. This was held allowable on cross-examination, the witness having previously shown his qualification to testify as an expert, and having already testified on the very question of the prisoner's insanity. Following the illustration already used, and it may be said that in Reddick's case the witness was dealing in known quantities, known to the court, jury, and counsel, as well as to the witness; therefore his answer would be a test of his intelligence. There is nothing in that case that justifies the asking of the question or in permitting the answer of Dr. Rice. That the answer was of serious importance is not denied. It was of great weight on one of the vital and difficult issues raised on the trial.

Substantially the same legal question is involved in the testimony of Dr. Fuller. He was asked a similar question under very much the same state of facts on direct examination. The observations made on Dr. Rice's testimony are applicable to that of Dr. Fuller, and it is not deemed important to notice more particularly the exact circumstances under which it was given. Many other objections are noticed in the brief of appellant, to the admission or rejection of evidence, but as most of them are not well founded, and others are not of importance, and not likely to occur on another trial, no further notice will be taken of them.

V. The instructions given by the court were very full, and

generally accurate. They have been commented on at a great
**5. Instructions should be applicable.** length, and particular ones have been subjected
to very searching criticism. It will only be
necessary to make some remarks on those particularly pointed
out as obnoxious, though we are not satisfied that there is
any error that would justify us in sending the case back for a
new trial were it not for the causes heretofore mentioned.
Our observations will be brief and only directed to those
points where it will be wise to make modifications on another
trial.

It seems to this court that there was no necessity for the
first and second instructions given at the instance of the
counsel for the state. That they are correct as law is not
questioned. That they were not calculated to assist the jury
in deciding on the issues submitted to them, seems plain.
Unless there is some cause not apparent in this case, such
instructions ought to be omitted.

Again, in the charge of the court is this statement: "A
few years ago it was a common error to suppose that certain
vegetable poisons left no trace exclusive of any other symp-
toms of disease; but at present such progress has been made
in analytical chemistry that it is almost as easy to discover
vestiges of vegetable as of mineral poisons." We cannot
say that this is not true. It is a fact lying more especially
in the domain of another profession. But such authorities
as are in reach of this court would justify the remarks that
the learned judge was led into error in his statement.
2 Beck's Med. Jur., 416, 419, 420; Wharton & Stille's Med.
Jur., § 1120. These authorities are positive, and against the
statement made in the charge. The same conclusion may
without violence be drawn from the medical testimony in
this case. The most that we feel justified in saying about it
is, that we must withhold our assent from it until better
advised. The statement must have had weight, when taken
in connection with the rest of the paragraph, in giving the
jury confidence in the chemical analysis that was in evidence,

and which was attacked on the part of the defense by testimony of a high character.

A single remark as to instruction No. 40, asked by the defendant and refused: A portion of the law in that instruction is elsewhere given, but we fail to observe in any part of the charge any notice of the effect on the mind of the prisoner of the perilous position in which he was placed, and the great care which should be taken in weighing admissions made under such circumstances. Many of the instructions asked by the defendant and refused are given elsewhere, and some of them are couched in too strong language, and all such were properly refused.

On the first question decided Mr. Justice Valentine does not concur with the other Justices of the court.

For the reasons given the motion for a new trial should have been sustained; wherefore the judgment is reversed with directions to award a new trial.

BREWER, J., concurring.

VALENTINE, J.: I concur with my brethren in the decision of this case, but I do not concur in all that is decided by them. I think the court below unquestionably erred in its rulings while impanneling the jury. The court below held that C. R. Anderson, Thomas Newton and J. A. Maghee were competent jurors, and they served on the trial of the case as such. These three persons, as well as all the other jurors, were examined upon their *voir dire* as to their competency to serve as jurors. On the examination of Anderson by counsel he stated that he had formed an opinion in the case; on the examination by the court he stated that it was only an impression. The same thing is partially at least true with regard to Newton. The last statement made by Newton is as follows: "I have formed an opinion; but only what could be changed by testimony; it would need testimony; only the impression is not fixed; it may be changed." Maghee stated that he had formed a belief, and not an impression, or an opinion. All three stated that it would require testimony to

remove their impressions, opinions or beliefs. A portion of Maghee's statement is as follows: "I cannot say it (my belief) is firmly settled. I would wish to be satisfied with regard to whether my belief is right or not. It would require evidence to satisfy me that my belief was wrong; it would require testimony." The impressions or opinions of Anderson and Newton were founded upon newspaper accounts. What the belief of Maghee was founded upon is not shown. We are therefore left to conjecture. The opinions, impressions, or beliefs, that these three jurors entertained were not merely hypothetical opinions founded on certain evidence, of the truth or falsity of which they entertained no opinion. Their opinions, impressions, or beliefs, whether strong or weak, were absolute and unconditional. It is true, that the opinions of Anderson and Newton were founded upon newspaper accounts alone, but these two jurors believed the newspaper accounts to be true. But it is not shown that Maghee's belief was founded on newspaper accounts. His belief may have been produced from a very different source; possibly by talking with the witnesses. It is true that the opinions, impressions, or beliefs of these jurors were not so firmly fixed, nor so strong, that they could not be removed or changed by evidence. But probably no opinions founded on moral evidence can ever be so firmly fixed or so strong that they cannot be removed or changed by evidence. I suppose that but few persons, perhaps none, who heard all the evidence at the trial of this case have opinions so firmly fixed or so strong that such opinions could not be removed or changed by evidence; but still it will hardly be claimed that any person who heard all the evidence at the trial would be a competent juror on a re-trial.

With reference to what the common law was, and what the decisions of other states have been upon this question, I would refer to counsels' briefs and the authorities there cited. With reference to what our own laws are I will now proceed to consider:

Section 10 of the "Bill of Rights," (Constitution of the State of Kansas,) reads as follows:

"SEC. 10. In all prosecutions, the accused shall be allowed to appear and defend in person, or by counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face, and to have compulsory process to compel the attendance of witnesses in his behalf, and a speedy public trial *by an impartial jury* of the county or district in which the offense is alleged to have been committed. No person shall be a witness against himself, or be twice put in jeopardy for the same offense."

From 1859 up to 1868 the statutes of this state concerning competency of jurors provided among other things as follows:

"It shall be a good cause of challenge to a juror, that he has formed or delivered an opinion on the issue or any material fact to be tried; but if it appear that such opinion is founded only on rumor, and not such as to prejudice or bias the mind of the juror, he may be sworn." (Comp. Laws of 1862, page 263, § 184.)

In 1868 said statute was so amended as to read as follows:

"It shall be a good cause of challenge to a juror, that he has formed or expressed an opinion on the issue or any material fact to be tried." (Gen. Stat., 853, § 205.)

It will be noticed that the words, "but if it appear that such opinion is founded only on rumor, and not such as to prejudice or bias the mind of the juror, he may be sworn," found in the statute of 1859, (published in the Comp. Laws of 1862, page 263,) was left out of the statute of 1868, and the statute of 1859 was repealed. (Gen. Stat., 877, § 361.) The statutes of 1868, under which this action was tried, also provide that "A defendant is presumed to be innocent until the contrary is proved. When there is a reasonable doubt whether his guilt is satisfactorily shown, he must be acquitted," etc. (Gen. Stat., 856, § 228.)

For the purposes of this case we must presume that all the impressions, opinions, and beliefs of said jurors were against the defendant. Then, were said jurors competent to serve in this case? The constitution guarantees to every person accused of crime an *impartial jury*. (Bill of Rights, § 10.) Was this an impartial jury? A juror's mind, in order to be

impartial, should be at least blank upon the question of the guilt or innocence of the accused. How can a jury be impartial, or do justice to the accused, when their minds are already preoccupied with the opinion, the impression, or the belief, that the accused is guilty? Can any man judge impartially of a matter which he has already predetermined in a particular way in his own mind? Probably nearly every man will think that he himself can do so, but no man will think that any other man could. And it makes no difference whether a man has founded his opinion upon evidence or not. If he has founded his opinion upon evidence, it will take evidence to remove that opinion. But if he has jumped to conclusions without evidence, he is certainly an unfit person to serve as a juror, (more unfit indeed than a person who has formed his opinion upon evidence,) and could not try a question impartially upon evidence.

But the statute of 1868 seems to have settled this question. Instead of extending the door wider for those who have formed or expressed an opinion in the case to become competent jurors, it has absolutely closed it. While under the statute of 1859 a person who had formed an opinion founded on rumor alone, and not such an opinion as would bias or prejudice his mind, was a competent juror, under the statute of 1868 no person who has formed any opinion upon the merits of the case, in whatever way he may have formed it, or upon whatever evidence it may be founded, is not a competent juror. The rule of law as prescribed by the statutes of this state is, that the defendant must be presumed to be innocent until the contrary is proved; that it devolves upon the state to remove this presumption of innocence by evidence; and that it devolves upon the state to prove the defendant's guilt by evidence that will satisfy the jury beyond a reasonable doubt. The rule of law for this case seems however to have been, that the defendant is presumed, believed, or understood to be guilty by these three jurors, (and it might as well upon principle have been by the whole of the jury,) until it is proved to them that he

19-A

is not guilty, and that it devolves upon the defendant to prove his innocence. But how much evidence it would require to prove the defendant's innocence is not shown or declared. How much evidence it would take to place the minds of these jurors in equilibrium, or how much it would take to render them impartial judges of the defendant's guilt or innocence, or how much it would take to enable them to presume the defendant to be innocent, as the law requires, is not shown by the record. In fact, they never did presume the defendant to be innocent, but always believed him to be guilty, and found him guilty. The defendant exhausted all his peremptory challenges upon other persons who had been summoned to serve as jurors, and therefore could not remove these three jurors by peremptory challenge. Hence he was tried by these three jurors, together with nine others, and convicted and sentenced to be executed.

I think the judgment of the court below should be reversed as well for error in impanneling the jury as for the other errors mentioned in the opinion delivered by the Chief Justice.