THE STATE OF KANSAS v. JESSIE MORRISON.

No. 12,802.   (68 Pac. 48.)

SYLLABUS BY THE COURT.

1. JURY AND JURORS — *Qualifications.* A juror who was fully acquainted with the facts and circumstances of a homicide and who has a decided and abiding opinion as to the guilt of the defendant is disqualified, although he may think and state that he is without prejudice and can give an impartial verdict based on the evidence and instructions of the court.

2. —— *Rumors and Newspaper Reports.* Ordinarily rumors and newspaper reports are not accepted as conclusive, but the competency of a juror depends upon the character, and not the source, of an opinion; and whatever the source of information, if there is no conviction of the mind, an impression or opinion unmixed with prejudice, which is wholly contingent upon the truth or falsity of the information and would readily yield to testimony, there is no disqualification.

3. —— *Opinions and Impressions.* The fact that a juror may call an opinion an impression, or state that it will not affect his verdict, will not render him competent, where it appears from the whole testimony that the impression has the fixedness and strength of a settled opinion and is one which would probably influence his mind and verdict.

4. HOMICIDE — *Immediate Declaration of Decedent.* A declaration by a person whose throat was cut, windpipe severed, and therefore speechless, written from three to five minutes after her assailant had been pulled away from her, that "Jess Morrison killed me," which appears to have been spontaneous and not the result of premeditation or design, is admissible as part of the *res gestæ.*

5. —— *Declarations after Hope of Recovery Abandoned.* A declaration of the cause and circumstances of a homicide, made by one who had been informed by physicians and relatives and admonished by the character and condition of her wounds that she was about to die, and which was made when hope of recovery had been abandoned, may be given in evidence against the accused.

6. —— *Declarations Written by Another.* The fact that the declaration was written by another and partly brought out by questions, the answers to which were communicated by signs, is no objection to its admission, where it appears that, after the declaration had been completed, it was understandingly read and signed by the declarant.

Appeal from Butler district court; G. P. AIKMAN, judge. Opinion filed March 8, 1902. *In banc.* Reversed.

*A. A. Godard,* attorney-general, *J. S. West, W. M. Rees,* county attorney, *Hamilton & Leydig, E. N. Smith,* and *E. B. Brumback,* for The State.

*Redden & Kramer, H. W. Schumacher,* and *V. P. Mooney,* for appellant.

The opinion of the court was delivered by

JOHNSTON, J.: On June 22, 1900, Jessie Morrison cut the throat of Clara Wiley Castle with a razor, from the effect of which the latter died. A few days before the tragedy Clara Wiley was married to Olin Castle, and it is claimed that Jessie Morrison had been cor responding with and was greatly attached to him, and was led by jealousy to attack and kill her successful rival. She denied that she was moved by such motive, and claimed that, when making a call on the bride of a few days, the latter, who was jealous of Jessie, accused her of clandestinely meeting Mr. Castle several times and at different places, and of trying to lure him away from his wife ; that finally, in a fit of rage, Mrs. Castle attacked her with a razor, and in the struggle which followed defendant wrested the razor from Mrs. Castle's hand, and in self-defense inflicted the wounds which resulted in the latter's death. About twenty cuts and gashes were made on Mrs. Castle, mostly on or near the throat. There was a deep cut on the back of the neck, several cuts on each side of the throat leading into a common breach, entirely severing the windpipe. At another place the windpipe was cut, and the esophagus was also cut in

two places.   Although she lived until July 10, 1900, she was unable to speak and could only communicate to others by signs and by writing.   A prosecution for murder was instituted against Jessie Morrison, and the result was a conviction for manslaughter in the second degree.   From this conviction she appeals, and alleges 155 assignments of error, many of which are without merit, and only a few of them will require special attention.

The objections mainly discussed by counsel are those made in the impaneling of the jury and in overruling the challenges of jurors.   The impaneling of the jury was a difficult and tedious task, owing to the prominence of the parties, the pitiless and savage attack, which attracted general attention, and the fact that Mrs. Castle lived for several weeks when her head was almost severed from her body.   These and other circumstances made it a notorious case, and naturally wide publicity was given to the tragedy and its details.   Many of the jurors examined, and quite a number of those retained, had heard and read full accounts of the transaction and had formed or expressed opinions as to the guilt or innocence of the defendant. For instance, S. L. Motter, who had heard and read of the circumstances and had discussed them with others, and who had read an account of the preliminary examination in the papers, and a full account of a previous trial, which included the evidence of the witnesses, the instructions of the court, and the arguments of counsel, stated first that an impression had been made on his mind, but that it was not so fixed and positive as would prevent his rendering a fair and impartial verdict.   On cross-examination, however, he stated :

"Ques.   Did any person in your presence express

any opinion about the case—as to the merits of the case, as to the innocence or guilt of the defendant? Ans. Yes, sir.

"Q. Quite a number? A. Yes, sir, several.

"Q. Did you express any opinion as to the guilt or innocence of the defendant? A. Yes, sir.

"Q. Several times? A. Oh, I don't know how often.

"Q. But you have several times? A. Yes, sir, I have.

"Q. As to the guilt or innocence of the defendant? A. Yes, sir.

"Q. And at the time you expressed that opinion you had an opinion—had formed an opinion as to the guilt or innocence of the defendant? A. Yes, sir.

"Q. I will ask you if you have that opinion now? A. Yes, sir.

"Q. And until it is removed by evidence it will remain in your mind? A. Yes, sir.

"Q. And would require evidence to remove it? A. Yes, sir.

"Q. Until it is removed by evidence, you would retain an opinion? A. Yes, sir."

Upon redirect examination, he stated that the opinion he had was an impression and that he thought he could fairly try the case; that he understood the difference between an impression and a fixed and positive opinion, but was unable to define it. He then said:

"Ques. Now, I will ask if you do not mean that it is such an opinion as could be changed by evidence? Ans. Yes, sir.

"Q. And that is your opinion or impression, is it? A. Yes, sir.

"Q. And that is what you mean by saying it is not fixed and settled? A. I believe so.

"Q. And so would require evidence to change it? A. Yes, sir.

"Q. And unless evidence is introduced to change it, you still would have that opinion? A. Yes, sir."

Isaac Good was held to be qualified as a juror. Upon inquiry it developed that he had read an account of the evidence and the proceedings in court at former hearings and trials, from which he had formed an opinion or impression, but it was not of a fixed or positive character. Upon further inquiry, he stated:

"Ques. And in this case you did form more of an opinion than you ordinarily do from the newspaper reports, did you not?  Ans. I did.

"Q. Have you ever expressed any opinion as to the guilt or innocence of the defendant, Jessie Morrison?  A. I have.

"Q. Have you ever formed any opinion as to the guilt or innocence of the defendant, Jessie Morrison?  A. Yes, sir.

"Q. Do you have that opinion now?  A. Yes, sir; I have that opinion now.

"Q. Is it of such a fixed and positive character that it would require evidence to remove it?  A. It would."

Then, again:

"Ques. From what you heard and read, have you any opinion as to whether or not Jessie Morrison murdered Clara Wiley Castle?  Ans. I have.

"Q. And it would require evidence to remove that opinion, would it?  A. Yes, sir."

In answer to other questions by the prosecution, he stated that the opinion which he had was not of a fixed or abiding character, and that his mind was open to a fair consideration of the testimony that might be offered.

The challenge of A. G. Lamb was overruled. He stated that he had formed an opinion, but that it was not a positive one. He had heard persons describe the tragedy in a circumstantial way, had read full accounts of the same in the papers, including reports of

43—64 KAN.

the preliminary examination and of the previous trial, and had even been in the court-room and heard some of the witnesses testify.  The inquiry was made :

"Ques.  Now, did you express any opinion as to the guilt or innocence of Miss Morrison?  Ans. Yes, sir.

"Q.  That opinion was formed from what you had heard of the evidence and what you had heard people tell of the evidence ?  A.  What I had heard and read ; not from the witnesses.

"Q.  Have you formed any opinion as to whether Miss Morrison was guilty ?  A.  Yes, sir.

"Q.  And you have that opinion now ?  A.  Yes, sir.

"Q.  Would it require evidence to remove it ?  A. Yes, sir.

"Q.  Is it of such a fixed and positive character that it would remain in your mind until it is removed by evidence ?  A.  Yes, sir."

He further stated that when a person was charged with an offense, and brought. to trial, he looked upon him as being guilty until he was proved innocent. When asked what he understood by a fixed and positive opinion, he stated that, if he saw the occurrence, it would be fixed ; that he was not sure he could keep the evidence which he had heard and read distinct from the evidence which he would hear on the trial, but that he did not think what he had formerly heard and read would influence him in the trial of the case. In further explanation, he stated that he thought he understood the difference between an impression and an opinion.

"Ques.  What is your understanding of the difference?  Ans. Opinion is what I think, I don't know.

"Q.  Opinion is what you think, but don't know? A.  Yes, sir.

"Q.  What do you understand an impression is? A.  That is a great deal the same.

"Q. In fact, in your mind there is no distinction between them?  A. No, sir."

E. R. McDaniels was called, and retained over objection, although he stated that he had formed an opinion from what he had heard and read of the occurrence. In answer to the county attorney, he stated that the opinion was such an one as he gets from reading the newspapers, and was really an impression; that he could fairly try the case regardless of the opinion or impression entertained. Upon further inquiry, however, he stated that he had read full accounts of the occurrence and of the trials in the Kansas City and local papers, and that he had talked with others about the tragedy and the trials; that he had heard others express opinions and had expressed an opinion himself as to the guilt of the defendant. In explaining the strength of his opinion and the difference between an impression and an opinion, he stated that to have a fixed and settled opinion a person must have seen an act done, while an impression would be what he got from reading or being told by others.

C. T. Marcum, who had learned the facts of the case from several sources, had an opinion as to the guilt of the defendant and had expressed it quite a number of times to others. When interrogated, he stated that it was only a slight opinion, but that until he heard evidence to remove it, it would remain on his mind, and that it would require substantial evidence to remove it.

O. M. Kramer, who had heard and read a full account of the testimony on former hearings, stated that he had formed an opinion as to the guilt of the defendant and still held it. He stated that the opinion could be removed by evidence, and that he was without prejudice against the defendant. He further

stated that the arrest, preliminary examination and filing of an information against a person led him to think that such person was guilty.

F. C. Simons, who had heard and discussed the facts of the case, as well as read the testimony of witnesses given on former trials, stated that he had formed an opinion as to the guilt or innocence of the defendant; that he still had it, and that an account of the evidence given by witnesses made more of an impression on his mind than an ordinary newspaper report, but that he was without bias or prejudice against the defendant, and believed that he could render a fair and impartial verdict regardless of what he had heard and read and of the opinion he held.

G. W. Gibson had read a full report of the tragedy and trial in the papers and believed them to be true. He had discussed the details of the case to some extent with others and had read the testimony of the witnesses, the arguments of counsel and the instructions of the court in the papers, and he had expressed an opinion as to the guilt of Miss Morrison, which opinion he still had. He believed he could be governed by the evidence given on the witness-stand and that his mind was open to a fair and impartial consideration of the case.

R. E. Stevens was another juror who, like the others, had heard and read full accounts of the transaction and the trials, and who stated that he had an opinion as to the guilt of the defendant, but that it was such an opinion as would give way to the testimony of witnesses; and in answer to the county attorney stated that he could fairly try the case and render an impartial verdict. When inquiry was made as to the opinion which he held, he stated that he believed the accounts which he had read and heard to be true, and

had no reason to change his mind since the hearing and reading of those accounts. Then this followed :

"Ques. Mr. Stevens, this opinion or impression that you have, is it of such character that would be readily removed by the evidence that you would hear upon the witness-stand? Ans. It would take evidence.

"Q. Read the question to him (and the question is reread to the juror). A. I don't believe it would be very readily removed.

"Q. Do you think your opinion is of a fixed and positive nature? A. No, sir; it is not fixed and positive, but it would take strong evidence to remove it."

The foregoing is a sample and, perhaps, the strongest, of the disqualifying testimony from jurors who were retained over the objections of the defendant. Others, whose disqualifications were substantially similar to those named, were held to be qualified. Under the rules established by the code and applied by former decisions, it must be held that the challenges to several of the jurors should have been sustained. As has been seen, the challenged jurors had heard and discussed the material facts of the case, had even read the evidence of witnesses and heard the arguments of counsel at former hearings and trials, and, knowing all the facts substantially as they would be presented again on the trial, they had formed and expressed opinions as to the guilt of the defendant, which they still entertained. These opinions, too, appear to have been of a settled and abiding character, which necessarily influenced the juror entertaining them, and, under the rule in Kansas, disqualified them.

Unlike some of the states from which authorities are cited, we have a statute which expressly declares that "it shall be a good cause of challenge to a juror that he has formed or expressed an opinion on the is-

sue or any material fact to be tried." Courts cannot ignore·this provision nor whittle it away by interpretation. A defendant cannot be compelled to accept a juror who has either formed or expressed a preconceived opinion as to the defendant's guilt. It is true that an opinion of a juror upon a conceded fact does not disqualify him, and hence a belief that the defendant killed Mrs. Castle was not a good objection. A juror, however, who held or expressed a decided opinion as to whether the defendant was justified in killing the deceased or as to her guilt should have been excluded from the jury box. What, then, shall be deemed a disqualifying opinion? It is not, as has been determined, a light and transient impression obtained from vague rumors or the reading of brief and partial newspaper reports, which in the nature of things would not close the mind of an unprejudiced man against testimony. (*The State v. Medlicott*, 9 Kan. 279; *The State v. Treadwell*, 54 id. 511, 38 Pac. 813; *The State v. Thomas*, 58 id. 806, 51 Pac. 228; *The State v. Kornstett*, 62 id. 221, 61 Pac. 805.) On the other hand, a strong impression or opinion, of a fixed and abiding character, based on information derived from witnesses or from those acquainted with the facts and deemed reliable, will disqualify, although the juror himself may think and state that he can fairly try the case. (*The State v. Miller*, 29 Kan. 43; *The State v. Beatty*, 45 id. 492, 25 Pac. 899; *The State v. Snodgrass*, 52 id. 174, 34 Pac. 750; *The State v. Beuerman*, 59 id. 586, 53 Pac. 874; *The State v. Start*, 60 id. 256, 56 Pac. 15; *The State v. Otto*, 61 id. 58, 58 Pac. 995.)

The fact that a juror may call an opinion an impression, or state that it will not affect his verdict, will not render him competent where it appears from the whole testimony that the impression has such

fixedness and strength that it would probably influence his mind and verdict; nor will the fact that the opinion has been gained from newspapers necessarily take away the disqualification.   The competency of the juror depends on the character and not the source of the opinion.   Ordinarily rumors or newspaper reports are not accepted as conclusive, and an opinion formed from such source is usually contingent upon the truth or falsity of the reports, so that a juror can honestly say that he has no decided or abiding opinion. Whatever the source of information, if there is no conviction of the mind, an opinion unmixed with prejudice, which is wholly contingent upon the truth or falsity of the information and would yield readily to testimony, is no disqualification.   Here, however, a reading of the examination of the objectionable jurors shows that their opinions were of a decided and enduring character, which would not yield readily to evidence, and which, as some of them declared, it would take strong evidence to remove.   We are aware that it is not easy to obtain a jury to try a case marked with the atrocity and sensational features of this one; but, however notorious the case may be, the defendant is entitled to be tried by a jury having the statutory qualifications—men who have not prejudged the case.

The facts in the case are not such as to induce a diligent search for errors nor to make slight errors seem to be important; but an examination of the record satisfies us that disqualified jurors were retained over the objection of the defendant.   For this reason the verdict must be set aside.

Error is assigned on the admission of a paper on, which Mrs. Castle had written, "Jess Morrison killed me."   The defendant and the deceased were alone in

Mrs. Castle's house when the cutting was done, and neighbors, hearing the cries of distress, broke into the house and found the defendant over the deceased, who was lying on the floor, her throat cut and hacked in a horrible manner, the deadly weapon lying beside her.  She was bathed in blood, her windpipe severed, and consequently was speechless.   While she lay in this condition, and within three to five minutes after the defendant had been pulled away from her, she motioned for pencil and paper, and when they were handed to her she wrote the brief sentence above quoted.  It was the first expression after the cutting, and was so closely connected with it and so spontaneous that it may be fairly regarded as part of the *res gestæ*. Under the circumstances, the interval of time which elapsed between the cutting and the writing of the words is not an objection to its admission, nor does it place it among past occurrences or isolated utterances.

" If declarations of a past occurrence are made under such circumstances as will raise the reasonable presumption that they are the spontaneous utterances of thoughts created by or springing out of the transaction itself, and so soon thereafter as to exclude the presumption that they are the result of premeditation and design, they will be admissible as part of the *res gestæ*."   ( 21 A. & E. Encycl. of L. 101.)

The declaration by Mrs. Castle appears to have been voluntary and spontaneous, and so closely connected with it as to be really a part of the transaction, and to exclude the idea of fabrication.

For another reason no error was committed by admitting the declaration.   That the defendant killed the deceased is a conceded fact, and even if it were no part of the *res gestæ*, error could not have been predicated upon it.

The admission of the dying declaration of Mrs. Cas-

tle is made a ground of error.   Although she lived some time after the statement was signed, it is clear that it was made in the full belief and sense of impending death.   She had been informed by the physicians and by her mother that the end was near, and the character and condition of her wounds admonished her that she was about to die.   Evidently she possessed the mental qualifications to understand her condition and the purpose and effect of her declaration.   It was true that it was written by another and partly elicited by questions, but these are not objections to its admission.   After it was written, she read it over carefully, and then asked for a pencil, with which she deliberately affixed her signature.   The testimony indicates that the statement was fairly written, that she fully understood its contents when she signed it, and that it was signed when hope or expectation of recovery had been abandoned.   No error was committed in its admission ; but, for the error committed in the impaneling of the jury, the judgment of the district court must be reversed and the cause remanded for a new trial.

All the Justices concurring.