THE STATE OF KANSAS v. JESSIE MORRISON.

No. 13,329. (72 Pac. 554.)

SYLLABUS BY THE COURT.

1. TRIAL JUDGE—*Prejudice Must Be Shown.* It is not the opinion which a trial judge may entertain as to the guilt or innocence of a defendant about to be put upon trial in his court which disqualifies such judge and entitles the defendant to a change of venue, but it is the existence of such prejudice in the mind of the judge against the defendant as may prevent defendant from having a fair and impartial trial of his cause which disqualifies, and such prejudice must be clearly made to appear.

2. HOMICIDE—*Second Trial, after Reversal.* In this state a defendant tried for murder upon an information charging murder in the first degree and convicted of manslaughter in the second degree, who appeals to this court and obtains a reversal of such

The State v. Morrison.

judgment, may again be placed upon trial for murder in the first degree and convicted of that offense or any lesser degree of crime charged in the information.

3. ———— *Qualifications of Jurors, Killing Admitted.*  In the trial of a homicide case where defendant admits the killing and justifies on the ground of self-defense, the act of killing is not the issue to be tried in the case, and a juror who, in his examination upon his *voir dire*, states that he has formed or expressed an opinion as to the guilt of defendant is not for that reason alone disqualified, if from his entire examination it clearly appears that such opinion is based upon the belief that defendant killed deceased, and that the juror has neither formed nor expressed any opinion as to whether the defendant was justified in taking the life of deceased, as that is the material fact or issue to be tried.

4. PRACTICE, SUPREME COURT—*Second Review.*  All questions of law once considered and determined on a former appeal become the law of the case and are conclusive upon a second appeal to the same appellate court.

5. JURY AND JURORS—*Qualifications—Conditions Precedent.* When affidavits charging jurors with having expressed opinions as to the guilt of defendant prior to their being called as jurors are relied on to annul a verdict and obtain a new trial, it must be clearly shown that such expressions of opinion, if known, would have been sufficient to sustain a challenge for cause at the time the jury were impaneled; and it must also be unequivocally shown that neither the defendant nor counsel for defendant knew the facts at the time the jury were impaneled.

Appeal from Butler district court; G. P. AIKMAN, judge. .Opinion filed May 9, 1903.   Affirmed.

*C. C. Coleman*, attorney-general, *W. M. Rees*, county attorney, *Hamilton & Leydig, E. N. Smith*, and *E. B. Brumback*, for The State.

*Redden & Kramer, H. W. Schumacher*, and *V. P. Mooney*, for appellant.

The opinion of the court was delivered by

POLLOCK, J. :  On the morning of the 22d day of June, 1900, in the city of El Dorado, the defendant, Jessie Morrison, cut the throat of Clara Wiley Castle, the

10—67 KAN.

wife, and scarcely a week the bride, of Olin Castle.
The tragedy occurred in the home of the bride.    The
instrument used was a razor.    The deed was, in all its
surrroundings, accomplishment, and conclusion, most
pathetic, terrifying, and bloody.    No less than twenty
gashes with the razor were inflicted on the person of
the deceased.    The windpipe was cut in two places,
the esophagus was twice severed, yet in this horrible
condition the wife lived until the 10th day of July.
During all of this time her condition was indeed most
pitiable.    The nature of the encounter, the conditions
under which the tragedy occurred, the choice of in-
strument employed, and the severity of its use, caused
wide-spread excitement and comment.    The tragedy,
in all of its horrible details and ghastly conclusion,
the ensuing arrest of defendant, her examination and
subsequent trials, were by the public press and report
spread broadcast over the country *ad nauseam.*

Defendant was arrested, charged with the murder of
Mrs. Castle.    The first trial resulted in a disagreement
of the jury.    At the second trial defendant was con-
victed of manslaughter in the second degree and ap-
pealed to this court, where the judgment of conviction
was reversed for errors committed in the impaneling
of the jury.    The case will be found reported in 64
Kan. 669, 68 Pac. 48.    She has been tried again, con-
victed of murder in the second degree, and appeals to
this court.

The theory of the state in regard to the tragedy is
this : Defendant had been greatly attached to Olin
Castle prior to his marriage; had corresponded and
kept company with him, and evidently anticipated her
marriage to him.    Upon his marriage to Miss Wiley
defendant became intensely jealous of her successful
rival; went to the bride's home, carrying with her a

The State v. Morrison.

letter which it was claimed related to Olin Castle; over this letter in some way a controversy arose; defendant handed the letter to Mrs. Castle to read, and while she was reading it defendant attacked her with the razor which she carried with her for that purpose.

The defense admits the killing, but justifies upon the ground of self-defense.   The theory of the defense is that Mrs. Castle was jealous of her husband's affection for defendant; that it was her belief that defendant was attempting to entice her husband from her; that she called Miss Morrison into her house as she was passing, accused her of secret relations with her husband, and attacked her with the razor used; that in the struggle defendant wrested it from deceased and used it in her defense.   As evidence of this theory, it was shown that defendant received upon her throat cuts from the razor.   The state, however, contends that such wounds were slight and self-inflicted.

The record is voluminous in the extreme, the assignments of error very numerous, the briefs of counsel lengthy.   A large amount of labor has been performed in the examination of, and consultation over, the case. In the short limits of a legal opinion it will be impossible to give in detail separate consideration to each independent assignment of error, nor indeed do we deem this necessary in expressing the conclusion we have reached in regard to the case.   The former decision in this court is controlling and conclusive upon us now as to some of the important objections here urged.

The first ground of error urged is the order of the trial court denying the motion made by defendant for a change of venue.   This application was based upon the bias and prejudice of the trial judge.   In its support there were filed the affidavits of James T. Butler and Henry Swan, alleging, in substance, that

in the month of December, 1900, during the progress of the first trial of the case and before the commencement of the term of office (but after his election) of the present trial judge, the Honorable G. P. Aikman, in response to an inquiry about the case, he said: "I could have been on the defense in that case, but did not feel like defending a person that was as guilty as I believe Jessie Morrison is"; and further said: "The Morrison case was one of the issues on which I was elected." There was also filed the affidavit of E. G. Grinstead, made on the 27th day of May, 1901, alleging, in substance, that in the month of July, 1900, Judge Aikman had stated to him "that Jessie Morrison was a murderess and ought to be hung; . . . that when he became convinced of the guilt of a person as he was of the guilt of said Jessie Morrison, he had no hesitation in saying so." The affidavit alleged this statement to have been made in the law office of Judge Aikman, in the city of El Dorado. . There was also filed in support of the application the affidavit of defendant as to certain matters occurring at the former trial of the case before Judge Aikman. Our attention is also called to various matters appearing in the record of the present trial which, it is claimed, tend to show bias and prejudice on the part of the trial judge toward defendant, preventing a fair trial.

1. Prejudice of trial judge.

In opposition to the motion there was filed the affidavit of W. E. McGinnis, who alleged that he had a desk in the office of Judge Aikman, and was present at the time Grinstead called and introduced himself to the judge; that he heard all the conversation between them; that no such statement as related by Grinstead was made by Judge Aikman; on the contrary, that the Morrison case was not mentioned at all between

the parties.   The trial judge also filed a statement in writing in which he positively disclaimed making any such statements as are attributed to him by Grinstead, Butler and Swan in their affidavits.   He also as positively disclaimed any bias or prejudice whatever against defendant, or that anything which he might have said or done on the previous trial was in any manner or way influenced by his feelings toward defendant, but, on the contrary, asserted in terms most positive his entire ability fairly and impartially to try the case.   He further stated that he at no time was consulted by any one as to employment on behalf of the defendant.

In brief, this is the record upon this application. Had the affidavit of Grinstead stood unchallenged in the record, the allegations therein contained would go far to sustain the charge of prejudice made against the trial judge, but this affidavit is flatly contradicted both by the affidavit of McGinnis and the statement of the trial judge.   Again, as appears from the record, this affidavit was taken by the attorneys for the defense prior to the first trial of the cause presided over by Judge Aikman, but was not filed or used until the present application was made.

As to the affidavits of Butler and Swan, it may be said that the belief or disbelief of a trial judge in the guilt of a defendant put upon trial before him is not a test of his qualification to preside at such trial.   A trial judge may be convinced from his personal knowledge of the case, or what he has heard from others, of the guilt of one put upon trial before him, and yet with the utmost fairness and impartiality conduct the trial and give the defendant a fair and impartial hearing.   It is the existence of prejudice or bias in the mind of the trial court against defendant which must

be clearly shown in support of an application for a change of venue from the court presided over by such judge, not the belief of the judge in the guilt of defendant. In the case of *City of Emporia v. Volmer*, 12 Kan. 622, it was held:

"In criminal cases, on an application for change of venue on account of the prejudice of the judge, such facts and circumstances must be shown by affidavits or other evidence as clearly establish such prejudice; and unless it be by such testimony clearly established, a reviewing court will sustain an overruling of the application, on the ground that the judge must have been personally conscious of the falsity or non-existence of the grounds alleged."

In the case of *The State v. Bohan*, 19 Kan. 28, it was ruled:

"Neither unfavorable comments as to the innocence of a defendant in a criminal case, after a verdict of guilty by a jury, made by a trial judge upon the evidence introduced in the case, when passing sentence upon such defendant, nor adverse rulings, nor errors of judgment, of themselves amount to prejudice on the part of a judge so as to compel a removal of the case (upon a new trial granted by the supreme court) to the district court of some county in a different judicial district."

These cases were commented upon and followed in the case of *The State v. Grinstead*, 62 Kan. 593, 64 Pac. 49. In the opinion in that case it was said of the conduct of the trial judge at the trial after the denial of the application for the change of venue:

"However, his right to a change of venue is not to be determined from the fact that after it had been denied he received a fair and impartial trial, but from the showing made by him in support of his application."

An examination of these cases will, we think, dis-

close in each a stronger showing in support of the application for the change of venue than appears from the record in the present case.   From the record before us, in the light of the former holdings of this court, we cannot say prejudicial error warranting a reversal of the judgment rendered was committed by the trial court in denying the application for the change of venue.

At the second trial of the case a verdict of manslaughter in the second degree was returned by the jury.   Upon this verdict judgment was entered against defendant sentencing her to imprisonment in the state penitentiary for the term of five years.   That judgment of conviction was reversed and annulled by this court.   Defendant has been again tried, the jury returning a verdict against her of murder in the second degree.   Upon this verdict the judgment of the court has been entered condemning her to the penitentiary of the state for a term of twenty-five years.   It is now earnestly contended by her counsel that the verdict and judgment at the former trial work an acquittal of all the degrees of felonious homicide superior to that of manslaughter in the second degree, and as a necessary consequence the present judgment cannot stand, but must be reversed.

2. Second trial, after reversal.

In other jurisdictions, from courts renowned for their high standing, learning, and great ability, there is much authority and many adjudicated cases in support of this contention.   Indeed, the argument made in its support is most convincing.   This court, however, in the morning of its existence, as early as the case of *The State v. McCord*, 8 Kan. 232, 12 Am. Rep. 469, gave consideration to this question, and upon mature deliberation held, with many other states,

against the contention here made by the counsel for defendant.   To the decision thus early made in this court it has steadfastly adhered, as an examination of the many cases in which this question has arisen will show.   (*The State v. Hart*, 33 Kan. 218, 6 Pac. 288; *The State v. Miller*, 35 id. 328, 10 Pac. 865; *The State v. Terreso*, 56 id. 126, 42 Pac. 354.)   We deem it sufficient to say upon this branch of the case that we do not feel at liberty to reopen and reexamine this question, but must regard it in this state as finally and conclusively settled and determined.

It is strenuously insisted that the trial court has again committed error in the impaneling of the jury. As has been seen, on account of the recent marriage of the deceased; the prior relations of the defendant and the husband of deceased; the merci-

**3. Qualifications of jurors.**

less character and savage nature of the encounter; the lingering death of deceased; the arrest of defendant; her succeeding examination and trials, all of which were fully reported in the public press and by report spread broadcast over the country, the sympathies and passions of the people were aroused and intensified to an extent seldom accompanying the commission of any crime except that of the most notorious, amounting to a great public calamity.   As a necessary consequence, the task of securing a jury was both tedious and difficult.   Hundreds of jurors were called and subjected to the most searching examination, often upon matters of minor import and immaterial detail.   Such being the circumstances surrounding the trial, it is difficult to conceive how a jury, some of whom were not more or less conversant with the facts of the case, at least by report, could be secured.   The two jurors against whom the most seri-

ous objections are urged were Harry Potts and Thomas Glaze. The most objectionable features of their examination touching their qualification to serve as jurors in the case appear as follows:

"Ques. From what you (Mr. Potts) read in the St. Louis *Globe* and other papers and what you may have heard about the case, did you form in your own mind an opinion as to the guilt or innocence of the defendant? Ans. Yes, sir.

"Q. Have you that opinion now? A. Yes, sir.

"Q. Mr. Potts, did you believe these statements that you read at the time you read them? A. Yes, sir; I suppose I did.

"Q. Now from what you read, or from any other source, did you ever form any opinion as to the guilt or innocence of the defendant, Jessie Morrison? A. Yes, sir.

"Q. Have you that opinion now? A. Yes, sir.

"Q. Would it take evidence to remove it? A. Yes, sir.

"Q. If you should sit as a juror in this case, that opinion would remain in your mind until you would hear some evidence different from that opinion? A. Yes, sir.

"Q. Would it not take pretty strong or substantial evidence to remove it? A. It would have to take something that I thought was good.

"Q. Something that you thought was good and reliable? A. Yes, sir.

"Q. Do you remember whether you have ever expressed an opinion as to her guilt or innocence; not likely, but do you remember whether you have or not? A. Yes, sir; I probably have.

"Q. You have? A. Yes, sir."

Juror Glaze:

"Ques. You do not know whether or not what you did read was true or not? Ans. Nothing more than just supposed it was true by them being printed.

"Q. But you had no means of knowing whether it was a fair and impartial account of the trial or not? A. No, sir; I did not know anything about that; only supposed it was true.

"Q. Have you any opinion at this time as to the guilt or innocence of the defendant? A. Well, I suppose I could answer that in this way : to a certain extent I have.

"Q. If I understand you, Mr. Glaze, you have not made up your mind yet? A. I have not exactly made up my mind. I did not hear anything of the witnesses and I could not definitely answer that.

"Q. Did you ever talk with any person that was present at either of those trials? A. I never talked with any of the witnesses. I have talked with persons that were in the court-room.

"Q. Well, did those persons relate to you what the evidence was or tell you what the evidence was or what was done in court? A. They told me what they had heard sworn at that time.

"Q. Was there in any paper that you read what was claimed was the dying statement of Clara Wiley Castle as given to the jury? A. Yes, sir.

"Q. Did you read that? A. I did.

"Q. Have you ever heard any one express an opinion as to the guilt or innocence of defendant, Jessie Morrison? A. Oh, yes; I have heard them express their opinion.

"Q. Have you ever formed any opinion as to her guilt or innocence? A. I suppose that I have, to a certain extent, no doubt.

"Q. Have you any opinion now as to the guilt or innocence of defendant, Jessie Morrison? A. Why, I could answer that question in this way : that I have my opinion as to certain things and other things I do not know as I can say that I have a firm opinion.

"Q. I would like, Mr. Glaze, for you to give me an answer. Have you any opinion as to her guilt or innocence? ( By the Court :) If you do not feel you have any opinion, say so, Mr. Glaze. A. Why, I have an opinion in one way."

Upon further examination, the juror Potts testified as follows :

"Ques. Does that opinion depend solely upon the truth or falsity of what you read in those papers and what you have heard ?  Ans. Yes, sir ; that is all the source I have.

"Q. That is the only source you have to form that opinion from ?  A. Yes, sir.

"Q. From what you have read about the case and from the rumors you have heard, have you any bias or prejudice either for or against the defendant ?  A. No, sir.

"Q. Is that opinion you have formed from reading these accounts and from the rumors such an opinion as would readily yield to testimony you might hear from the witness-stand, if you are accepted as a juror here ?  A. Yes, sir.

"Q. You think it would ?  A. Yes, sir.

"Q. It is not a fixed and settled opinion ?  A. No, sir.

"Q. Would slight evidence remove it ?  A. Yes, sir.

"Q. Mr. Potts, do you feel that this opinion, whatever opinion you may have, is of a light character, and not firmly fixed in your mind ?  A. Yes, sir ; of a light character.

"Q. Have you heard any one express any opinion as to the guilt or innocence of Miss Morrison ?  A. Yes, sir ; both ways.

"Q. I want to know whether it would take strong evidence or slight evidence to remove it ?  A. Well, slight evidence would remove it.

"Q. Do you feel sure of that, now ; that is your feeling, is it ?  A. Yes, sir.

"Q. If it should turn out in this case that defendant killed Clara Wiley Castle, have you an opinion now as to whether or not that was done in self-defense ?  A. I could not say.

"Q. Have you any opinion as to that ?  If it should turn out in this case that defendant killed Clara Wiley Castle, have you any opinion now as to whether or not that was done in self-defense ?  A. I have not."

The juror Glaze, upon further examination, testified as follows:

"Ques. You understand, Mr. Glaze, that under certain circumstances a person might be justified in taking the life of another, if done in self-defense? Ans. I understand they have a right in self-defense.

"Q. Now, did you form any opinion as to whether defendant in this case acted in self-defense or not in what she did? A. Why, I do not know as I can say that I formed an opinion, because I do not really understand how I could.

"Q. You did not understand how the facts were? A. No, sir; because I didn't read all of the papers.

"Q. Have you any opinion at this time as to the guilt or innocence of the defendant? A. Why, I suppose I could answer that in this way: to a certain extent I have.

"Q. Is that such an opinion that would weigh against the testimony of witnesses that were sworn to appear before you and testified to the facts as they knew them? A. I do not think it would.

"Q. Mr. Glaze, do you feel that your mind is now open to a fair and impartial consideration of the testimony that might be offered? A. I think so; yes, sir.

"Q. Did you have an opinion as to whether or not Clara Wiley Castle was killed? A. Yes, sir; I have an opinion that she was killed.

"Q. But you had no opinion as to whether this defendant was justified in doing so? A. Why, I do not know whether she had a right to do so or not.

"Q. And you have no opinion upon that subject? A. No, sir."

While it is shown by the above examination that the jurors had read newspaper reports of the tragedy and trials, and from such reports had obtained information regarding the case, yet, in this enlightened age, the ability of the inhabitants of this state to read being almost universal, the daily or weekly paper appearing in almost every household with the regu-

larity of the seasons, it ceases to be a matter of wonder that the jurors called should have read or heard of the case and the facts in relation thereto. Indeed, in a case so notorious, it would be a matter of astonishment if they had not. In considering and weighing the above testimony touching the disqualification of the jurors, the true issue in the case is important and must be borne in mind. In this case the fact that defendant killed deceased was admitted, and was not in any way an issue on the trial. The material fact or issue presented to the jury for their determination was, Was the killing done in self-defense? Section 205 of the criminal code (Gen. Stat. 1901, § 5647) provides: "It shall be a good cause of challenge to a juror that he has formed or expressed an opinion on the issue or any material fact to be tried." While in the first instance the jurors testified that they held an opinion as to the guilt or innocence of the accused, gathered from newspaper reading and reports, yet it was made quite clear by their subsequent examination that such opinion was not a settled conviction as to the guilt or innocence of the accused at all, but was only an opinion upon the admitted fact that defendant had killed the deceased. This the jurors most naturally confounded with an opinion as to the guilt of defendant. As to the real issue in the case, as to the material fact the jury were called to try—that is to say, whether the defendant was justified in the killing because acting in self-defense—they had no opinion whatever, and so positively stated. In the case of *The State v. O'Shea*, 60 Kan. 772, 57 Pac. 970, this court held:

"The mere fact that a person called as a juror had formed or expressed an opinion that the defendant shot and killed the deceased did not disqualify him

as a juror, where the shooting and killing was conceded by the defendant, who claimed that it was done in self-defense.''

In the opinion it was said :

''Throughout the trial the shooting and consequent death of Dawson were conceded, and the claim of the defendant was that the act was justifiable, being done in self-defense. Opinions upon matters not in issue do not disqualify the jurors entertaining them, and especially where, as in this case, it is shown that they have not formed or expressed an opinion as to the guilt or innocence of the defendant, and where there is nothing indicating that they cannot give the defendant a fair and impartial trial. (*The State v. Wells*, 28 Kan. 321; *The State v. Gould*, 40 id. 258, 19 Pac. 739; *The State v. Wells*, 54 id. 166, 37 Pac. 1005.)''

In the opinion in this case on the former appeal it was said :

''It is true that an opinion of a juror upon a conceded fact does not disqualify him, and hence a belief that the defendant killed Mrs. Castle was not a good objection. A juror, however, who held or expressed a decided opinion as to whether the defendant was justified in killing the deceased or as to her guilt should have been excluded from the jury-box.''

Again, from the entire examination it does not appear that the opinion formed or expressed by the jurors was a settled conviction of the mind, or an opinion of a positive and fixed character, but it was such an opinion as is formed in the ordinary mind from the reading of a newspaper account of a transaction with which they are not otherwise familiar.

It has been many times held by this court that an opinion such as will disqualify a juror from trying a case must be not only an opinion as to a material fact or the issue to be tried, but must be of a positive and fixed character, where the jurors otherwise appear to

be free from any bias or prejudice in the case.   In the case of *The State v. Treadwell*, 54 Kan. 513, 38 Pac. 813, it was held :

"Some of the jurors had impressions or beliefs as to the commission of the offense charged which were not of a positive and fixed character, but were derived solely from rumor and newspaper statements, and they appeared to have been free from any bias or predjudice and to be able to fairly consider the testimony and render an impartial verdict in the case. *Held*, that the overruling of the challenge to the retention of such jurors is not sufficient ground for reversal."

In the opinion on the former appeal of this case it was said :

"What, then, shall be deemed a disqualifying opinion ?  It is not, as has been determined, a light and transient impression obtained from vague rumors or the reading of brief and partial newspaper reports, which in the nature of things would not close the mind of an unpredjudiced man against testimony. (*The State v. Medlicott*, 9 Kan. 279 ; *The State v. Treadwell*, 54 id. 511, 38 Pac. 813 ; *The State v. Thomas*, 58 id. 806, 51 Pac. 228 ; *The State v Kornstett*, 62 id. 221, 61 Pac. 805.)   On the other hand, a strong impression or opinion of a fixed and abiding character, based on information derived from witnesses or from those acquainted with the facts and deemed reliable, will disqualify, although the juror himself may think and state that he can fairly try the case.   (*The State v. Miller*, 29 Kan. 43 ; *The State v. Beatty*, 45 id. 492, 25 Pac. 899 ; *The State v. Snodgrass*, 52 id. 174, 34 Pac. 750 ; *The State v. Beuerman*, 59 id. 586, 53 Pac. 874 ; *The State v. Start*, 60 id. 256, 56 Pac. 15 ; *The State v. Otto*, 61 id. 58, 58 Pac. 995.)"

From a consideration of the entire testimony of the jurors, we arrive at the conclusion that the only positive and fixed opinion formed by them was that the

defendant had taken the life of the deceased; that this opinion was of a fixed and positive nature, but concerned an admitted fact immaterial to the real issue tried; that as to the legal guilt or innocence of the accused the jurors were without a disqualifying opinion.

We have examined the record as to the jurors McClain and Ayers, and find no error in excluding the one and retaining the other.

Many assignments of error are based upon the reception and rejection of testimony. In so far as they relate to the dying statement of deceased, it is sufficient to say that this question was fully considered in the former appeal, and the decision there made is conclusive here.

It is contended that the court erred in refusing to receive evidence of the manner, demeanor, actions, conversation and conduct of defendant on the morning of the tragedy. There are cases in which this class of evidence is admissible. Had the defense interposed been insanity, evidence of this character would be highly proper as bearing directly upon the issue tendered. Had the state in this case relied on circumstantial evidence to prove the offense, such evidence would have been competent and material as a link in the chain of circumstances tending to connect defendant with, or disconnect her from, the scene of the tragedy and participation therein. ( *The State v. Baldwin*, 36 Kan. 1, 12 Pac. 318.) But in this case the presence of defendant at the scene of the tragedy, her participation therein, the use of the instrument employed, were all admitted facts. As to which was the aggressor was the sole subject of inquiry. In this case the class of evidence offered was properly excluded. As touching upon the question here con-

sidered, see *Garlitz v. State*, 71 Md. 293, 18 Atl. 39, 4 L. R. A. 601. Again, much of this class of testimony was inadmissible as violating that principle of law which excludes self-serving acts and declarations.

It was attempted to be shown by the evidence of members of the family of defendant that they had not seen the razor found at the scene of the tragedy after its commission before the encounter occurred. This evidence was excluded. In this there was no error.

Over the objection of the defense, the state was permitted to ask defendant, a witness in her own behalf, as to statements made to third persons claimed to be in conflict with her testimony. The questions so asked were for the purpose of discrediting the testimony of defendant, and were proper.

As to the remaining assignments of error based upon the evidence in the record, it is sufficient to say that we have examined each carefully and find no error therein prejudicial to the rights of defendant.

Numerous assignments of error are based upon the charge of the court to the jury and the refusal of the court to instruct as requested by counsel for the defense. The instructions given by the court were forty-nine in number and in the exact language of those in the record on the former appeal. They covered every phase of the case. The defense requested the giving of fifty-seven separate instructions. It is impossible to treat the objections urged separately. We shall notice only those made the more prominent in the briefs and argument of counsel.

The court, in its forty-seventh instruction, attempted a definition of the term "reasonable doubt." This instruction reads:

"The court further instructs the jury as a matter of law, that the doubt which the juror is allowed to

11—67 KAN.

retain in his own mind, and under the influence of which he should frame a verdict of not guilty, must always be a reasonable one. A doubt produced by undue sensibility in the mind of any juror, in view of the conseqences of his verdict, is not a reasonable doubt, and a juror is not allowed to create sources or materials of doubt by resorting to trivial and fanciful suppositions and remote conjectures as to possible state of facts, differing from that established by the evidence. You are not at liberty to disbelieve as jurors, if you believe as men. Your oath imposes on you no obligation to doubt where no doubt would exist if no oath had been administered.''

Special complaint is made of the closing lines of this instruction. As has been often said by this court, the term ''reasonable doubt'' best defines itself. All attempts at definition are likely to prove confusing and dangerous. (*The State v. Wilson*, 66 Kan. 472, 71 Pac. 849; *The State v. Kearley*, 26 id. 77; *The State v. Bridges*, 29 id. 138; *The State v. Davis*, 48 id. 1, 28 Pac. 1092.) The question, however, here presented is, Does the definition given constitute prejudicial error? An instruction containing language almost identical with that here under consideration was approved by the supreme court of Illinois in the celebrated case of *Spies et al. v. The People*, 122 Ill. 1, 12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320, following language used in *Nevling v. Commonwealth*, 98 Pa. St. 322. The ruling in the Spies case was afterward followed in *Watt v. The People*, 126 Ill. 9, 18 N. E. 340, 1 L. R. A. 403.

It is contended that the case of *State v. Ruby*, 61 Iowa, 86, 15 N. W. 848, in principle condemns the instruction given. The instruction in that case read as follows:

''You are to base your verdict solely on the evidence introduced on the trial, and to consider only the case

of the defendant on trial.   On the other hand, you are
to view this evidence as reasonable men.   Your oaths
as jurors simply bind you to confine yourselves to the
evidence and be governed by the law of the case as
given by the court.   Within this limit your minds in
the jury-box should act as they would outside the
jury-box.   In other words, what satisfies the mind
outside of the jury-box should do so within.''

The last sentence of this instruction was held er-
roneous.   As an independent proposition the last sen-
tence is undoubtedly erroneous.   When considered in
connection with the other portions of the instruction,
the error is not so apparent.   While the attempt here
made to define the term ''reasonable doubt'' is not
commended, yet as an instruction, almost identical in
form, has received the sanction of the courts, we are
inclined to the opinion that the giving of it did not
constitute prejudicial error.

Many of the requests made by defendant's counsel
for special instructions related to the dying statement
of deceased.   It is now the settled law of this case
that this statement was properly received in evidence.
As to its consideration by the jury, and the weight it
should receive, the court instructed (No. 39) as fol-
lows:

''The court has admitted in evidence a statement
bearing date July 4, 1900, which it is claimed by the
state was made by Clara Wiley Castle, and at a time
when she was suffering from fatal wounds inflicted
by defendant, and from which it is claimed she after-
ward died, and which statement, it is claimed by the
state, should be considered as the dying declaration
of said Clara Wiley Castle.   A person who is suffer-
ing from fatal wounds and who is weak and speech-
less from said wounds may make her dying statement
by such signs as clearly show that she knows and
fully understands what she is doing, and the state-
ment she is making, and is mentally conscious, and

which signs clearly and distinctly convey her meaning, and the statement of such person may be reduced to writing, where such person is weak and speechless, by a third party, and if read over by the declarant, or read over to her by some other person, and clearly and fully understood and assented to by her as her statement, and by her signed, it becomes her statement, if intended as such by her. In order to be considered by the jury as the dying declaration of said Clara Wiley Castle, it must clearly and satisfactorily appear, from the evidence and all the circumstances in the case, to the jury, that the statement offered in evidence by the state is the statement of Clara Wiley Castle regarding the encounter between her and the defendant, and that such statement was made by Clara Wiley Castle at a time when she was *in extremis* and in the full belief and sense of impending death, and that death was imminent, and in the full belief that she was going to die from the wounds inflicted on her by the defendant, and that death was near, and at a time when the deceased had abandoned all hope of recovery, then, in that case, it is your duty to consider such statement as the dying declaration of said Clara Wiley Castle, and to weigh, consider and measure such statement by the same rules of evidence as the testimony of any other witness in the case ; and in determining the weight and credit to be given to such declaration you may take into consideration all the circumstances under which the declaration was made, giving just weight and credit only as you think and believe from the evidence and all the circumstances it is entitled to. You are the sole and exclusive judges as to whether such conditions existed as are herein named, and of the weight and credibility of such statement.''

This instruction fully covers the subject-matter of the dying statement, and properly states the law in relation thereto ; hence, there was no error in refusing to charge as requested by counsel for defendant.

The State v. Morrison.

The charge of the court, considered as a whole, is singularly free from objectionable features.

In support of the motion for a new trial, and for the purpose of showing the disqualification of the jurors, Davis, Murphy, and Burch, there were filed the affidavits of various persons, alleging that prior to the trial said jurors had expressed positive opinions as to the guilt of the defendant. Many of the affidavits alleged the statements to have been made in the presence of the affiant and others. The record shows that said jurors were examined touching their qualifications to sit as jurors on the trial of the case. The juror Burch was challenged for cause, which challenge was overruled, but no exception to this ruling saved. The jurors Murphy and Davis were not challenged for cause. In opposition to the motion for a new trial, these jurors made affidavits denying in the most positive terms the making of the disqualifying statements attributed to them by the parties making the affidavits in support of the motion. One witness was called by the defense and examined in open court in support of the motion, and testified as to a disqualifying statement made by the juror Thomas Glaze prior to the trial. The juror in turn positively denied the making of the statement.

Upon this record the motion was submitted to, and denied by, the court. It is earnestly insisted that this was error. Was the showing so made sufficient to annul the verdict? We think not, and for the following reasons : In the first place, the positive denials of the jurors to the making of the disqualifying statements are entitled to much consideration and weight. In the case of *Territory v. Burgess*, 8 Mont. 57, 19 Pac. 558, 1 L. R. A. 808, it was held :

"After conviction, the defendant, to sustain his mo-

tion for a new trial, filed the affidavits of two persons; one of whom swore that the juror, Brassy, had expressed an opinion as to the guilt of the accused before the trial, and the other that the juror, Bowman, had also expressed such an opinion prior to his sitting on the jury. Both of the said jurors on their *voir dire* had stated that they had never expressed or formed an opinion concerning defendant's guilt or innocence. The two jurors were thereupon brought into court, sworn, and subjected to examination and cross-examination. They denied ever having expressed the opinion set forth in said affidavits. The motion for a new trial was denied. *Held,* that the denials of the jurors rebutted the statements of the persons making the affidavits, and that there was no error in denying a new trial."

Again, conceding the jurors to have made the statements alleged against them in the affidavits filed, the showing would then, in our judgment, be insufficient. It is neither shown nor attempted to be shown upon what information or supposed information concerning the facts of the case such statements were based. The jurors, at the time such statements were made, for aught that appears in the record, may have possessed no opportunity for knowledge of the facts of the case. On the contrary, the opinion so expressed may have been based wholly and entirely upon vague rumors and wild speculations as to the facts in the case, utterly unreliable and wholly at variance with the truth. In the case of *State v. Harrison,* 36 W. Va. 729, 15 S. E. 982, 18 L. R. A. 224, it was held:

"To set aside a verdict because of an opinion entertained by a juror before he was sworn, it ought to appear that such opinion was not merely unsubstantial and hypothetical, but such as would have excluded him from the jury had it been known before he was sworn."

The State v. Morrison.

In the opinion it was said :

"Should the verdict be set aside because Ward, one of the jurors, said before he was put on the jury that if the jury should return a verdict that Harrison was insane the jury ought to be hung, and that Harrison ought to be hung ?  In the first place, we do not know but that the opinion of the juror so expressed was a merely hypothetical, unsubstantial opinion, based on mere rumor, and not such as to have disqualified him had it been known when he was questioned on his *voir dire.*"

Again, we believe it is a rule of universal application, when a motion for a new trial is supported by affidavits charging members of the jury with having expressed an opinion as to the guilt of the defendant prior to the trial, that such affidavits must unequivocally state that both defendant and counsel for defendant were ignorant of such fact at the time of impaneling the jury. In the case at bar the affidavits filed close with the following language, either in substance or exact words : "The affiant further says that he never told the defendant or any of her attorneys of said conversation until after the trial had closed and the verdict had been rendered in said case."  Neither the defendant nor any of her counsel made any statement as to their knowledge of the making of such statements alleged to have been made by the jurors prior to the trial of the case.   Many of the statements are alleged to have been made in the presence of affiant and others.   The knowledge of the making of such statements, if made, could as well have been communicated by others present as by the affiant.   There is no allegation in the affidavits that affiant did not communicate to others than the defendant or her counsel the fact that such statements were made.   Error is never presumed.

5. Affidavits on motion for new trial.

The record is insufficient to show that the statements alleged to have been made by the jurors, if made, were unknown to the defendant or her counsel prior to the impaneling of the jury. In the case of *The State v. Ready*, 44 Kan. 700, 26 Pac. 58, this court held :

" Where an objection to the competency of a juror, namely, that he had served as a juror in the same court in another case within the preceding year, is first raised after verdict, and the party objecting fails to show that the ground of challenge was unknown to him and his counsel when the juror was accepted, or that he would have exercised his right of challenge if he had known that the cause therefor existed, or that he had suffered any prejudice by the retention of the juror, the objection will not be available for the purpose of obtaining a new trial."

In the case of *Achey v. The State*, 64 Ind. 56, it was held :

"Affidavits charging that one of the jurors, prior to the impaneling of the jury, had expressed an opinion that the defendant was guilty and should be hung should unequivocally allege that the defendant and his counsel were ignorant of that fact prior to the impaneling of the jury."

In the opinion it was said :

"The affidavit of James M. Biddy states 'he did not inform said attorneys' (of appellant) 'of the matters, until after the conclusion of said trial'; but this goes only to what Biddy stated, and by no means shows that the appellant and his attorneys did not know all of the facts set up in the affidavits before the juror was impaneled."

In the case of *State v. Labauve*, 46 La. Ann. 548, 15 South. 172, it was held :

"The defendant was convicted of larceny. He alleges as errors : (2) That one of the jurors was a non-

resident.   This ground is not sustained by the facts certified to this court; moreover, application for a new trial for this cause should show not only that defendant was not, but that counsel also was not, aware of any fact affecting competency of juror, if he was incompetent."

In the case of *People v. Scott*, 56 Mich. 154, 22 N. W. 274, it was held:

"The impaneling and final acceptance of a jury by a court, is a judicial determination that the jurors are competent, and if any objection to the qualifications of a juror is known to a party before such determination, it cannot be raised afterward unless on exception to the overruling of a challenge."

In the case of *Busey v. State*, 85 Md. 115, 36 Atl. 257, it was held:

"After a party was convicted of assault and battery he sought to set aside the verdict because one of the jurors rendering it had been convicted of larceny and not pardoned.   The only evidence was an affidavit of defendant's counsel that he had been informed of the conviction after the jury had been impaneled. *Held*, 1st, that the ignorance of defendant's counsel does not imply the ignorance of the defendant himself, and if a party knows of a cause of challenge to a juror and does not take advantage of it while the jury is being impaneled, he cannot avail himself of the disqualification afterwards."

In the opinion in the case of *The State v. Jackson*, 27 Kan. 581, 584, 41 Am. Rep. 424, it was said:

"It has also been held that the right to object because of the incompetency of a juror may be waived in civil cases, even where the parties do not know of such incompetency until after the trial. (*Amherst v. Hadley*, 18 Mass. 38; *Jeffries v. Randall*, 14 id. 205; *Daniel v. Guy*, 23 Ark. 51.)

"And in criminal cases, even in prosecutions for murder, where the facts are known, an objection to

the competency of a juror comes too late, if it is made after verdict.    See the following capital cases : *The People v. Coffman,* 24 Cal. 230 ; *Lisle v. The State,* 6 Mo. 426 ; *Keener v. The State,* 18 Ga. 194.

"It has also been held in criminal cases, where the parties did not know the facts, that an objection to the competency of a juror must be made before the verdict is rendered, or it will be too late.    ( *The King v. Sutton,* 8 B. & C. 417 ; *Gillespie v. The State,* 8 Yerg. 507.)

"And the same rule seems to apply in capital cases as in others.    ( *Chase v. The People,* 40 Ill. 352 ; *Costly v. The State,* 19 Ga. 614, 628 ; *State v. Bunger,* 14 La. An. 465 ; *State v. Patrick,* 3 Jones (N. C.) L. 443 ; *State v. Bone,* 7 id. 121.)"

In the absence of a positive and unequivocal showing in the record that neither the defendant nor her counsel were aware of the statements alleged to have been made by the jurors at the time the jury were impaneled, the showing made is insufficient.

Upon application of the county attorney, made in open court at the conclusion of his testimony, Doctor Brownfield, a witness for the defense, was by order of the court placed in custody of the sheriff to await the filing of a complaint charging him with perjury, committed by him on the trial.    It is contended that this was error.    No authorities are cited in support of this contention and we have been unable to find any such holding.

In concluding this opinion it may be said that, owing to the importance of the case and the gravity of the punishment imposed, we have examined it with more than usual care.    Upon the theory of the tragedy maintained by the state, the murder of Clary Wiley Castle was a butchery of such a savage and vicious nature as has been rarely equaled, never excelled, in the criminal history of a civilized people.    Search for

a parallel so shocking must be instituted among the traditions of the aborigines.   Upon the theory held by the defense, the act of killing, with all its attendant circumstances, was justified by the peril in which defendant was placed.   These two theories have been fairly submitted to the decision of a jury.   That jury, by their verdict, have adopted the theory held by the state and repudiated that of the defense.   When the entire case in all its bearings, as protrayed by this record, is examined and considered, including the admitted facts, the age and sex of the parties, the time in their lives, the place of the encounter, the weapon employed, the repetition of its use, and the force exerted, the conviction becomes almost irresistible that this thing ought not to have been done ; and if, as found by the jury, it was not justified, it was indeed a brutal deed, utterly lacking in mitigating or extenuating circumstances, alike appalling to the mind and shocking to the sensibilities.

The judgment must be upheld.

All the Justices concurring.