No. 32,887

THE STATE OF KANSAS, *Appellee,* v. ABE McQUITTY, *Appellant.*

(65 P. 2d 260)

Opinion filed March 6, 1937.

*A. L. Maltby,* of Dodge City, for the appellant.

*Clarence V. Beck,* attorney general, and *A. E. Kramer,* county attorney, for the appellee.

The opinion of the court was delivered by

THIELE, J.: Appellant was convicted of the crime of robbery, and appeals.

He first complains that his motion to quash the information should have been sustained, it being contended the information was bad for duplicity. This complaint is based on a claim that the information charged him with grand larceny as well as with robbery. We need not set forth the entire information which charged that defendant did unlawfully, feloniously and willfully, and by means of threats of immediate bodily harm, "take, steal and carry away the sum of $60 in United States money, being the property of," etc., at that time the defendant and his codefendants being armed with deadly weapons, one shotgun and two revolvers, each of the defendants being in possession of one of the weapons, and that the money was taken "by means of the immediate fear of bodily harm to the persons of the owners of said money so taken, said fear being induced by the presentation and display of said weapons and against the will of the owners of said money, and was taken by means of the threats and duress occasioned by the use of said weapons and not otherwise," etc. The use of the words "take, steal and carry away," while appropriate to a charge of larceny, did not have the effect of charging such an offense in the information under consideration, nor did the inclusion of the amount alleged to have been taken have that effect. The whole tenor of the language used was to charge robbery and not larceny as is demonstrable from the use of the language last above quoted that the taking was "by means of the threats and duress occasioned by the use of said weapons and not otherwise." This indicated there was no intention to charge larceny and the trial court did not err in denying the motion to quash.

It is also urged the trial court should have sustained defendant's demurrer to the state's evidence. It is first contended that the information does not, in the language of the statute, charge that the taking of property was "by putting him in fear of some immediate injury to his person" (G. S. 1935, 21-527), and that there is no evidence the persons robbed were put in fear. In place of the word "injury" the word "harm" was used. A reference to any dictionary will show that the words are more or less synonymous. We refuse to believe the defendant, the jury, the court or any one else was in any way misled by the use of the word "harm."

The evidence showed that seven or eight men gathered at the apartment of one Harmsen and about 2:30 a. m. were engaged in a poker game when defendant and two others appeared armed with a shotgun and two revolvers and ordered the players to "stick them

up" and then proceeded to rob them. One witness was asked on direct examination if he was afraid, defendant's objection to the question as being leading was overruled, and he answered, "Well, a little." Harmsen, however, testified that if the gun had not been pointed at him he would not have let defendant and his codefendants take the money. In addition to this direct testimony, the jury was entitled to draw reasonable inferences from the testimony which clearly showed that defendant and his codefendants appeared, armed with a shotgun and revolvers, directed the players to put up their hands, that the players did so and while in that position the robbers took their money. The jury might well conclude that compliance with the robbers' demands was compelled by fear of immediate injury to the persons of one or more of the players.

After the verdict of guilty had been received, defendant filed his motion in arrest of judgment and his motion for a new trial. On the hearing of these motions, he urged the matters above mentioned and complained of the admission of certain evidence, hereafter mentioned, and now contends that it was error for the trial court to deny the motions.

Five witnesses testified to the robbery. Briefly stated, the evidence was to the effect the poker game was being held in Harmsen's apartment, which was on the second story of a certain building in Hugoton, and that the apartment was entered by use of an outside stairway which led to a landing that served Harmsen's and another apartment; that when the robbery occurred, two of the robbers entered Harmsen's apartment, the other remaining on the landing. Harmsen stated he could see the one on the landing and that it was the defendant, that one Pflummerfelt stood at his side, that immediately after the robbers left and went down the stairs Pflummerfelt said: "That's Abe McQuitty." Prine and Kilbourne testified that they saw but two robbers. Both testified with respect to the statement "That's Abe McQuitty," one of them attributing the remark to Pflummerfelt, the other to Harmsen. Pflummerfelt was also a witness, testified that he had known McQuitty for six or eight years; that he saw three robbers; that McQuitty had a mask over his mouth and up to his nose; that he observed McQuitty, and that after the robbers left, the first thing he did or said was to say that McQuitty was one of them. On cross-examination, he said he was sure he recognized McQuitty. Appellant complains that the testi-

mony of witnesses that Pflummerfelt (or Harmsen) stated "That's Abe McQuitty" was hearsay and inadmissible. It is quite obvious that while the robbery was in progress no one of the persons robbed, who may have recognized one of the robbers, would be likely to have spoken then, possibly from fear of reprisals against him personally. But because he waited until the robbers had left and then immediately stated his belief, does not mean his statement lacked spontaneity, or was the result of premeditation or design. For purposes of discussion, it makes little difference whether it was Harmsen or Pflummerfelt who said "That's Abe McQuitty." Both testified they recognized him. What would be more likely to occur as soon as the robbers left than for one of them to say he recognized one of the robbers?

In *State v. Morrison*, 64 Kan. 669, 68 Pac. 48, it was held that:

"A declaration by a person whose throat was cut, windpipe severed, and therefore speechless, written from three to five minutes after her assailant had been pulled away from her, that 'Jess Morrison killed me,' which appears to have been spontaneous and not the result of premeditation or design, is admissible as part of the *res gestae*." (Syl. ¶ 4.)

In *State v. Powers*, 92 Kan. 220, 139 Pac. 1166, it was held that an interval of fifteen minutes between the firing of a shot and the declarations of a person who was hit was not so long as to make the declaration not a part of the *res gestae*, it being there said:

"To be admissible as part of the *res gestae*, as that term is commonly used, it must have been uttered so near in point of time to the act referred to that the nervous excitement may still be supposed to dominate, and the reflective powers to be in abeyance." (p. 225.)

We do not believe the remarks to which objection was made were such that it can or should be said they were the result of premeditation, but on the contrary, that they were made under such circumstances that nervous excitement still dominated the declarant.

Appellant also complains that the following testimony was erroneously admitted: The sheriff of Baca county, Colorado, who arrested defendant in that county, was permitted to state that he was requested to arrest McQuitty; that he went to Walsh, Colo., and saw one Stockton and a man he didn't know but learned later was McQuitty; that he asked Stockton in McQuitty's presence if he knew McQuitty and received a negative answer; that he did not have on his official badge, but Stockton knew he was the sheriff. It appears McQuitty said nothing and did not disclose his identity. Appel-

lant contends that in the absence of any showing the sheriff was wearing his official badge or that McQuitty knew who he was, his failure to speak should not be used against him. It is urged the sheriff's testimony proved nothing and was incompetent and prejudicial. Standing alone, it may be doubted that the testimony is subject to the complaint against it. The city marshal of Walsh testified he knew McQuitty and also Stockton and Smith, also charged with the same crime, and that he saw them the night preceding the robbery at a pool hall in Walsh, Colo. A waitress at a café in Walsh testified Stockton and McQuitty ate breakfast there the morning of the robbery. The proprietor of the pool hall testified that Smith had worked in his place of business until 10 p. m. preceding the robbery. The testimony of all four witnesses did have some probative value. Other witnesses had identified Stockton and Smith as being the other two robbers present, and it was material to show their presence together, both before and after the alleged robbery, as well as circumstances relevant thereto. When the whole record is reviewed, it does not appear the evidence was incompetent, or that defendant was erroneously prejudiced by its being admitted.

On the hearing of the motion for a new trial, affidavits were presented containing matter tending to impeach the evidence of the witness Ford, the waitress above mentioned. There is no showing of diligence on the part of defendant, or that the affiants were not available as witnesses at the trial. At most, her testimony sought to be disproved varies little from that of the sheriff as to McQuitty and Stockton being together the morning of the robbery.

There is no showing the trial court erred either in denying the motion to quash, in overruling defendant's demurrer to the state's evidence or in denying defendant's motions in arrest of judgment and for a new trial. The judgment of the trial court is affirmed.